James D. SCHOWALTER, in his capacity as Commissioner of the Minnesota Department of Management and Budget, Petitioner,

v.

The STATE of Minnesota and the Taxpayers and Citizens of the State of Minnesota, Respondents.

No. A12–0622.

Supreme Court of Minnesota.

Oct. 31, 2012.

Jessica L. Roe, Curtis L. Christensen, Patrick B. Griffin, Kutak Rock LLP, Minneapolis, MN, for petitioner.

Lori Swanson, Attorney General, Alan I. Gilbert, Solicitor General, Jason Pleggenkuhle, Jacob Campion, Assistant Attorneys General, Saint Paul, MN, for respondents.

OPINION

PER CURIAM.

On April 5, 2012, petitioner James D. Schowalter, in his capacity as Commissioner of the Minnesota Department of Management and Budget ("Commissioner"), filed a Verified Complaint pursuant to the bond validation procedures in Minn.Stat. § 16A.99 (Supp.2011). In this original action, the Commissioner seeks validation of certain tobacco appropriation bonds to be issued to refund, in advance of maturity, outstanding tobacco securitization bonds issued in 2011. The only disputed issue in this proceeding is whether the proposed tobacco appropriation bonds are constitutional under Article XI, Sections 4 and 5 of the Minnesota Constitution. The Commissioner argues that the bonds do not implicate Minnesota's constitutional limitations on incurring public debt. Minnesota Attorney General Lori Swanson argues that the bonds constitute "a subterfuge to evade the balanced budget requirement" of the Minnesota Constitution. We conclude that the proposed tobacco appropriation bonds do not constitute public debt for which the State's full faith, credit, and taxing powers have been pledged under the plain language of Article XI, Section 4 of the Minnesota Constitution; therefore, the restrictions imposed by Section 5 do not apply to the bonds.

The material facts are undisputed for purposes of deciding the constitutionality of the proposed tobacco appropriation bonds.[1] Minnesota's tobacco settlement

---

1. On May 21, 2012, pursuant to an order filed April 16, 2012, the Commissioner and the Attorney General filed a joint submission, which contained, among other matters, a statement of the specific issues to be raised in this proceeding and a statement of undisputed

agreement, as amended in 2001, "requires certain tobacco companies to make annual . . . payments to the State in perpetuity." Several states that entered into similar settlement agreements with the tobacco industry have "securitized" this stream of annual payments to address budget deficits. In essence, these states have issued bonds to generate revenues, with the debt payment on the bonds secured by the state's annual stream of tobacco settlement payments. These bonds are typically referred to as tobacco securitization bonds.

Minnesota first considered issuing tobacco bonds in 2009, as part of the 2010–11 biennial budget process. Then–Governor Tim Pawlenty proposed in his biennial budget recommendation that the State would dedicate one-half of the tobacco settlement payments for 20 years to repay bonds for the University of Minnesota football stadium and bioscience program. Under the proposal, if the settlement payments were not sufficient to pay off the bonds, the Legislature "would be requested to appropriate money to pay the deficiency." In response to an inquiry from then-Senate Majority Leader Larry Pogemiller, Attorney General Lori Swanson analyzed the constitutionality of the proposed bonds and observed that the State would essentially be borrowing money to balance its budget. Noting that the Minnesota Constitution limits the purposes for which public debt may be incurred, the Attorney General was "not confident" that a court would uphold the constitutionality of the bonds in light of "the balanced budget requirement in the Minnesota Constitution." The tobacco bonds were not included as part of the 2010–11 biennial budget.

The use of tobacco bonds resurfaced in 2011 as a way to help address the projected deficit in the 2012–13 biennial budget. Legislative leaders proposed generating revenue by borrowing against future proceeds from the State's tobacco settlement. The 2011 special session legislation authorized the Commissioner to issue (1) tobacco securitization bonds, payable from and secured by the tobacco settlement payment revenues through the Tobacco Securitization Authority;[2] and (2) tobacco appropriation bonds, payable from the State's future general fund revenues and not secured by a particular revenue source. Act of July 20, 2011, 1st Spec. Sess., ch. 7, art. 11, 2011 Minn. Laws 977, 1067–83 (to be codified at Minn.Stat. §§ 16A.97–.99 (2012)). The Commissioner may issue bonds under either or both approaches, but the net proceeds of the bonds cannot exceed $640 million during fiscal years 2012 and 2013. Minn.Stat. § 16A.97 (Supp.2011). In addition, the Commissioner may issue tobacco appropriation bonds for the purpose of refunding any outstanding tobacco securitization bonds. Minn.Stat. § 16A.99, subd. 4. The legislation authorizing the tobacco appro-

material facts. Also on May 21, 2012, the parties submitted an Agreed Statement of the Record. The Agreed Statement of the Record contained the following five exhibits: (1) Order of the Commissioner of Management and Budget for the Issuance and Sale of State General Fund Appropriation Refunding Bonds; (2) Preliminary Official Statement for the State General Fund Appropriation Refunding Bonds; (3) February 23, 2009 letter from the Attorney General to Senate Majority Leader Larry Pogemiller and accompanying exhibit; (4) Bill Summary of 2011 Minnesota Laws 1st Special Session, chapter 7, article 11, prepared by the Minnesota House of Representatives Research Department; and (5) Official Statement for the Tobacco Settlement Revenue Bonds.

2. The Legislature created and established the Tobacco Securitization Authority, a new state entity, to issue tobacco securitization bonds. See Minn.Stat. § 16A.98, subds. 3–5 (Supp. 2011).

priation bonds includes a judicial validation procedure, conferring original jurisdiction on our court to determine the "validation" of the bonds. Minn.Stat. § 16A.99, subd. 9. There is no similar validation procedure for tobacco securitization bonds. *See* Minn.Stat. § 16A.98 (Supp.2011).

On November 29, 2011, the Tobacco Securitization Authority issued tobacco securitization bonds—the Tobacco Settlement Revenue Bonds—in the par amount of $756,955,000. The Tobacco Settlement Revenue Bonds consist of two series: the 2011A taxable series and the 2011B tax-exempt series. The State netted a total of $640 million from the transaction, which the State has used to pay debt service obligations.

The Tobacco Settlement Revenue Bonds are payable from and secured by the tobacco settlement payment revenues beginning in fiscal year 2014. *See* Minn.Stat. § 16A.98, subd. 2. These bonds are revenue bonds. By their terms, if the pledged tobacco settlement payments are not sufficient to cover debt service payments, "the bondholders cannot look to the State's general fund or other assets to satisfy the obligation." The Tobacco Settlement Revenue Bonds have "an all-in-true interest rate of 4.79%" and "received an A/A− rating from Standard & Poors and a BBB+ rating from Fitch."[3]

The Commissioner now proposes to issue tobacco appropriation bonds in an amount not to exceed $800 million to re-

fund in advance of maturity the outstanding Tobacco Settlement Revenue Bonds. Essentially, the Commissioner is seeking to refinance the Tobacco Settlement Revenue Bonds at a lower interest rate.

On April 5, 2012, the Commissioner issued an Order for the Issuance and Sale of State General Fund Appropriation Refunding Bonds ("Appropriation Refunding Bonds"). The Appropriation Refunding Bonds "would be issued in two series corresponding to those of the outstanding Tobacco Settlement Revenue Bonds: the 2012A taxable series not to exceed the aggregate principal amount of $80 million ... and the 2012B tax-exempt series not to exceed the aggregate principal amount of $720 million." Although not yet established, the Commissioner anticipates that the all-in-true interest rate of the Appropriation Refunding Bonds will be approximately 3.27%. The reason for the potentially lower interest rate is that the anticipated bond ratings will be in the A+ to AA range. The Commissioner estimates that the State will save $65,466,217 by issuing the Appropriation Refunding Bonds.

According to the Preliminary Official Statement, the Appropriation Refunding Bonds will be "payable in whole or in part from tobacco settlement revenues and from money appropriated by law in any biennium for payment of principal of and interest on the Bonds." In the bond documents,[4] the State "acknowledges itself to be indebted and promises to pay" the prin-

---

**3.** Although tobacco securitization bonds were projected to have a higher interest rate than tobacco appropriation bonds, the Commissioner issued the Tobacco Settlement Revenue Bonds because there was not enough time to conduct a validation proceeding regarding the issuance of tobacco appropriation bonds. However, the Tobacco Settlement Revenue Bonds are subject to extraordinary optional redemption rights in advance of maturity

(early repayment of the principal amount to the bondholders).

**4.** We use the term "bond documents" to refer to the Order of the Commissioner for the Issuance and Sale of the Appropriation Refunding Bonds, and the Preliminary Official Statement for the Appropriation Refunding Bonds, both of which are part of the Agreed Statement of the Record. *See supra* n. 1.

cipal and interest on the bonds. The State will do so, the bond documents explain, via a "continuing appropriation" to pay the principal and interest on an annual basis. The bond documents also state that "there shall be credited" to the applicable bond accounts an amount each year that is sufficient to pay the principal and interest due on the bonds.

The bond documents make clear, however, that the annual appropriations are "subject to the Legislature's discretionary authority at any time to modify or repeal the standing appropriation and the Governor's unallotment authority." Further, the statute authorizing the Appropriation Refunding Bonds specifies that the bonds "are not public debt of the state, and the full faith, credit, and taxing powers of the state are not pledged to the payment of the appropriation bonds or to any payment that the state agrees to make." Minn. Stat. § 16A.99, subd. 6. The bond documents contain the following statement, which tracks the language of the statute:

THE BONDS ARE NOT PUBLIC DEBT OF THE STATE, AND THE FULL FAITH, CREDIT, AND TAXING POWERS OF THE STATE ARE NOT PLEDGED TO THE PAYMENT OF THE BONDS OR TO ANY PAYMENT THAT THE STATE AGREES TO MAKE UNDER MINNESOTA STATUTES, SECTION 16A.99, AND THE ORDER. THE BONDS SHALL NOT BE OBLIGATIONS PAID DIRECTLY, IN WHOLE OR IN PART, FROM A TAX OF STATEWIDE APPLICATION ON ANY CLASS OF PROPERTY, INCOME, TRANSACTION, OR PRIVILEGE. THE BONDS SHALL BE PAYABLE IN EACH FISCAL YEAR ONLY FROM AMOUNTS THAT THE LEGISLATURE MAY APPROPRIATE FOR DEBT SERVICE FOR ANY FISCAL YEAR, PROVIDED THAT NOTHING IN MINNESOTA STATUTES, SECTION 16A.99, AND THE ORDER SHALL BE CONSTRUED TO REQUIRE THE STATE TO APPROPRIATE FUNDS SUFFICIENT TO MAKE DEBT SERVICE PAYMENTS WITH RESPECT TO THE BONDS IN ANY FISCAL YEAR. THE BONDS SHALL BE CANCELED AND SHALL NO LONGER BE OUTSTANDING ON THE EARLIER OF (A) THE FIRST DAY OF A FISCAL YEAR FOR WHICH THE LEGISLATURE SHALL NOT HAVE APPROPRIATED AMOUNTS SUFFICIENT FOR DEBT SERVICE, OR (B) THE DATE OF FINAL PAYMENT OF THE PRINCIPAL OF AND INTEREST ON THE BONDS.

See Minn.Stat. § 16A.99, subds. 3(b), 6. Although the parties agree that there is no "legal obligation on the part of a future legislature to appropriate funds," the parties also agree that a nonappropriation would adversely affect the State's credit rating and could "potentially affect the State's ability to access capital markets, at least in a cost-effective manner."

On April 5, 2012, the Commissioner filed a Verified Complaint seeking an order of our court confirming and validating the Appropriation Refunding Bonds pursuant to the procedures outlined in Minn.Stat. § 16A.99, subd. 9. Following service and publication as required by statute, we issued "an order directed against the state and taxpayers, citizens and others having or claiming any right, title, or interest affected by the issuance of appropriation bonds, or to be affected thereby," allowing all such persons "to appear before the Minnesota Supreme Court ... and show why the complaint should not be granted and the proceedings and bonds validated." Minn.Stat. § 16A.99, subd. 9(g); see also

*Schowalter v. State,* No. A12–0622, Order at 2–5 (Minn. filed Apr. 16, 2012).

We received briefs from the Commissioner and the Attorney General. In addition, we received a letter from a citizen, which asks us to conclude that the bonds are unconstitutional. The Commissioner and the Attorney General have raised two issues in this proceeding:

(1) Whether the Commissioner is permitted constitutionally to issue the Appropriation Refunding Bonds on behalf of the state in light of the restrictions imposed by Article XI, Sections 4 and 5 of the Minnesota Constitution.

(2) Whether the Commissioner has taken all action necessary and sufficient for the valid issuance of the Appropriation Refunding Bonds in accordance with law.

Although the Commissioner and the Attorney General take opposing positions on the constitutionality of the bonds, the Attorney General does not dispute that the Commissioner "has complied with the provisions of applicable Minnesota statutes in proposing the issuance of" the bonds if the court determines that the Commissioner has the authority under the Minnesota Constitution to issue the bonds.

## I.

■ We begin by addressing issues of jurisdiction and justiciability. Under the Minnesota Constitution, our court has "original jurisdiction in such remedial cases as are prescribed by law, and appellate jurisdiction in all cases." Minn. Const. art. VI, § 2. Specifically, as relevant here, the Legislature has provided our court with "original jurisdiction to determine the validation of appropriation bonds and all matters connected therewith." Minn.Stat. § 16A.99, subd. 9(c). By virtue of this statute, we have original jurisdiction in this matter. But we do not issue advisory opinions and we do not "decide cases merely to establish precedent." *In re Schmidt,* 443 N.W.2d 824, 826 (Minn. 1989); *see also State v. Arens,* 586 N.W.2d 131, 132 (Minn.1998) (noting that we "only decide actual controversies"); *In re Application of the Senate,* 10 Minn. 78 (Gil. 56) (1865) (holding that a statute authorizing either house of the Legislature to request an opinion of the court or a justice on any subject violated the separation-of-powers doctrine). Instead, we require the presence of a justiciable controversy as essential to our exercise of jurisdiction. *Izaak Walton League of Am. Endowment, Inc. v. State Dep't of Natural Res.,* 312 Minn. 587, 589, 252 N.W.2d 852, 854 (1977) (noting that the court may always raise issues of jurisdiction, even when not raised by the parties).

We have recognized that "[i]ssues which have no existence other than in the realm of future possibility are purely hypothetical and are not justiciable." *Lee v. Delmont,* 228 Minn. 101, 110, 36 N.W.2d 530, 537 (1949). For example, in a declaratory judgment action concerning the validity of certain county bonds to construct and improve school buildings, we concluded that there was no justiciable controversy where all the parties to the action supported the authority of the county board to issue and sell the bonds. *Cnty. Bd. of Educ. for Unorganized Territory of St. Louis Cnty. v. Borgen,* 192 Minn. 512, 514–16, 519, 257 N.W. 92, 93–95 (1934). We explained:

[T]he instant case utterly lacks the essential element of controversy—that there is wholly lacking an adverse party. Any opinion that might be written could only be an advisory one. As such it would be without force.

*Id.* at 519, 257 N.W. at 95.

■ But a justiciable controversy exists "if the claim (1) involves definite and con-

crete assertions of right that emanate from a legal source, (2) involves a genuine conflict in tangible interests between parties with adverse interests, and (3) is capable of specific resolution by judgment rather than presenting hypothetical facts that would form an advisory opinion." *Onvoy, Inc. v. ALLETE, Inc.,* 736 N.W.2d 611, 617–18 (Minn.2007). As noted above, the parties have raised two issues in this matter. We conclude that only the first issue—whether the Appropriation Refunding Bonds violate Article XI of the Minnesota Constitution—presents a justiciable controversy.[5]

■ The Commissioner and the Attorney General disagree on the constitutional issue, and a justiciable controversy is therefore adequately presented for our review. Specifically, the Commissioner takes the position that the bonds are constitutionally permissible under Article XI, Sections 4 and 5 of the Minnesota Constitution because the bonds do not constitute "public debt" within the meaning of the constitution. In contrast, the Attorney General argues that the bonds are not constitutional in light of the "balanced biennial budget requirement of the State Constitution."

■ As to the second issue presented for our review, however, the parties agree that the Commissioner has taken all procedural steps necessary to issue the bonds. The second issue thus lacks a genuine conflict in tangible interests between adverse parties because both parties agree that the Commissioner has taken all necessary steps under the law for issuance of the Appropriation Refunding Bonds. Accordingly, based on the parties' submissions and the posture of these proceedings, we conclude that the only justiciable con-

troversy before us is the constitutionality of the Appropriation Refunding Bonds under Article XI, Sections 4 and 5 of the Minnesota Constitution.

In concluding that the constitutional question presents a justiciable controversy, we recognize that Minn.Stat. § 16A.99, subd. 9, contemplates a broad judgment validating the bonds, which "is forever conclusive as to all matters adjudicated and as against all parties affected" and any others having or claiming any right or interest affected by the issuance of the bonds or who may "be affected in any way" by the issuance of the bonds. *Id.,* subd. 9(j). The statute further provides that the validity of the bonds, "including any remedies provided for their collection, shall never be called in question in any court by any person or party." *Id.* Because we conclude that the only justiciable controversy concerns the question of whether the bonds violate Article XI of the Minnesota Constitution and because we do not issue advisory opinions, our decision in this case does not resolve and it should not be read to resolve any issue beyond the Article XI question that we address below. *See generally* 2 M. David Gelfand, *State and Local Government Debt Financing* § 12:62 (2d ed. 2011) ("Because of the case and controversy limitation on judicial review and the correlative policy against the judicial rendering of advisory opinions, most states do not provide a formal process for judicial ratification of decisions by state and local government officials to borrow money for public activities.").

## II.

■ Having resolved the scope of our jurisdiction, we proceed to address the

---

5. The justiciability of the constitutional issue presents a close question in view of the fact that the Commissioner has no absolute obli-

gation to issue the bonds even if the bonds go through the "validation" procedure in Minn. Stat. § 16A.99, subd. 9.

constitutionality of the Appropriation Refunding Bonds, which are authorized by Minn.Stat. § 16A.99. We presume that statutes are constitutional. *Greene v. Comm'r of Minn. Dep't of Human Servs.*, 755 N.W.2d 713, 724–25 (Minn.2008). We exercise our power to declare a statute unconstitutional "with extreme caution and only when absolutely necessary." *In re Haggerty*, 448 N.W.2d 363, 364 (Minn. 1989). When resolving a constitutional issue, we look first to the language of the constitution. *See State ex rel. Gardner v. Holm*, 241 Minn. 125, 129, 62 N.W.2d 52, 55 (1954) (stating that "the language of the provision itself is the best evidence of the intention of the framers of the constitution"). If "the language of a constitutional provision is clear, there is no room for the application of rules of construction." *Kernan v. Holm*, 227 Minn. 89, 92, 34 N.W.2d 327, 329 (1948).

At issue here is whether the Appropriation Refunding Bonds constitute "public debt" that is subject to the restrictions set out in Article XI of the Minnesota Constitution. The Commissioner's primary argument is that the bonds are not public debt for which the State has pledged its full faith, credit, and taxing powers. The Attorney General's primary argument is that the bonds "improperly circumvent the State's balanced biennial budget requirement" and that "[s]uch deficit spending is clearly contrary to the purpose underlying the State's modern constitutional debt limitation provisions."

The Minnesota Constitution limits the purposes for which the State may contract "public debt." Minn. Const. art. XI, §§ 4, 5. Article XI, Section 4 provides: "The state may contract public debts for which its full faith, credit and taxing powers may be pledged at the times and in the manner authorized by law, but only for the purposes and subject to the conditions stated in section 5." The constitution defines "public debt" as follows:

> Public debt includes any obligation payable directly in whole or in part from a tax of state wide application on any class of property, income, transaction or privilege, but does not include any obligation which is payable from revenues other than taxes.

Minn. Const. art. XI, § 4. Article XI, Section 5 enumerates the limited purposes for which the State may contract public debt. These purposes include acquiring and bettering "public land and buildings and other public improvements of a capital nature"; refunding outstanding bonds; establishing and maintaining highways; promoting forestation; constructing, improving, and operating airports; and developing the State's agricultural resources. *Id.*

We begin our analysis by examining the language of the "public debt" provision in Article XI, Section 4. The constitutional limitations on contracting debt apply only to "public debts for which [the State's] full faith, credit and taxing powers" have been pledged. Minn. Const. art. XI, § 4. The Commissioner contends that the Appropriation Refunding Bonds do not involve a pledge of the State's full faith, credit, and taxing powers due to "the limitations expressly stated and imposed by" Minn.Stat. § 16A.99—the statute authorizing the bonds—and the bond documents themselves. For example, the bond documents specify that the Appropriation Refunding Bonds are not public debt and that the full faith, credit, and taxing powers of the State are not pledged to the repayment of the bonds. Although the Legislature has created a continuing appropriation to pay the principal and interest on the bonds on an annual basis, the bond documents make clear that the annual appropriation is subject to repeal, reduction, or unallotment, and that the bondholders have no remedy

for the State's failure to make principal or interest payments. According to the bond documents, if the Legislature fails to appropriate sufficient funds to make debt service payments in any fiscal year, the bonds are canceled. And if the bonds are canceled, the bond documents provide that "the State shall not be liable, obligated or in any way responsible for the payment of any principal of or interest on the Bonds coming due in succeeding fiscal years." Each of the statements in the bond documents mirrors the limitations articulated in Minn.Stat. § 16A.99, subds. 6, 8.

Although conceding that the Appropriation Refunding Bonds do not literally involve a pledge of the State's full faith, credit, and taxing powers, the Attorney General asks us to look beyond the legal disclaimers in the statute and bond documents and focus on "the reality of the transaction." Notwithstanding the clear language in the statute and bond documents, the Attorney General argues that we should treat the bonds as public debt under the Minnesota Constitution because of "the practical reality that future legislatures are obligated to continue to appropriate sufficient funds to satisfy the debt service on the bonds." Indeed, the parties agree that "[a] nonappropriation would adversely affect the State's credit rating for the debt it incurs, which would result in higher interest costs of subsequent bonds issued." According to the parties' joint submission, "future legislatures will experience economic and reputational pressure to annually appropriate sufficient funds to pay the principal and interest on outstanding appropriation bonds, as they become due."

 While the legislation authorizing the Appropriation Refunding Bonds and the bond documents themselves expressly and repeatedly disclaim the existence of any "public debt," we are not bound by the Legislature's characterization of the bonds. The interpretation of the constitutional phrase "public debt" is a judicial, not a legislative, question. *State v. Osterloh,* 275 N.W.2d 578, 579–80 (Minn.1978) (observing that courts are "the final interpretative body as to constitutional matters"); *see also Witzenburger v. State ex rel. Wyo. Cmty. Dev. Auth.,* 575 P.2d 1100, 1117 (Wyo.1978) (stating that the court is "not bound by the legislative self-serving declaration that the bonds are not debts of the State if, in fact, such declarations and required certificates do not represent conditions that actually exist"). In order to decide whether the Appropriation Refunding Bonds constitute a "public debt," we must look at whether the label matches the substance of the transaction. *See State ex rel. Ohio Funds Mgmt. Bd. v. Walker,* 55 Ohio St.3d 1, 561 N.E.2d 927, 932 (1990) (stating that the "court must examine a transaction not only for what it purports to be, but what it actually is").

We conclude that the disclaimers in the statute and the bond documents accurately describe the substance of the transaction. In several places, the bond documents—which control the legal rights of the bond issuer and bondholders—provide that the State is not required to appropriate sufficient funds to make debt service payments. Indeed, if an annual appropriation is not made, the bonds are canceled, and the State does not have any liability or obligation for any unpaid present or future principal or interest payments. In fact, the Attorney General acknowledges that "the bonds are not legally secured" by any "pledge" to fund the debt obligations. The risk of nonpayment is assumed by the bondholders, and this risk will be reflected in the bonds' credit ratings and interest rate. Accordingly, there is no basis upon which we could reasonably conclude that the bonds involve a pledge of the State's

full faith, credit, and taxing powers. *See, e.g., Wilson v. Ky. Transp. Cabinet,* 884 S.W.2d 641, 644 (Ky.1994) (holding that "[p]ractical, moral or righteous claims do not pass the test of contract or constitutional law").

Regardless of any pressure that may exist to repay the Appropriation Refunding Bonds, we cannot disregard the plain and unambiguous language of the Minnesota Constitution. The constitution imposes restrictions only upon public debt for which the State's full faith, credit, and taxing powers have been pledged. Minn. Const. art. XI, § 4. And in the case of the Appropriation Refunding Bonds, there is no pledge of the State's full faith, credit, and taxing powers.[6]

Notwithstanding the plain language of the "public debt" provision in the Minnesota Constitution, the Attorney General argues that the bonds are a "subterfuge" designed to evade the balanced budget requirement in the constitution. The Attorney General claims that the State is using the tobacco bonds to help balance the 2012–13 biennial budget, which is not a permissible reason for borrowing under the constitution. According to the Attorney General, "[t]he principal purpose" of the debt limitation provisions in the constitution "is to require that each biennial budget be balanced, *i.e.,* revenues equal expenditures, so that the State does not engage in deficit financing." In addition, the Attorney General quotes *Naftalin v. King* for the proposition that "this Court

has made it clear that creative forms of state financing will be scrutinized to ensure that the 'purpose of constitutional state debt limitations' are not undermined." 252 Minn. 381, 387 n. 6, 90 N.W.2d 185, 190 n. 6 (1958). The Commissioner responds that the Attorney General's "concerns" about the bonds "are in essence a policy argument best left to the Legislature."

We will "look beyond the words" of the constitution "for other indicia of intent" only when the language of the constitution is ambiguous. *State v. Brooks,* 604 N.W.2d 345, 348 (Minn.2000). When a constitutional provision "is couched in broad and comprehensive language, the court cannot add exceptions to it." *Clark v. Ritchie,* 787 N.W.2d 142, 147 (Minn.2010). In this case, the Attorney General does not argue that any provision of Article XI is ambiguous. In fact, the Attorney General relies on the "plain language" of the "public debt" provision to argue that the Appropriation Refunding Bonds are an "obligation" of the State "expressly 'payable' from future general fund appropriations."

The Attorney General's main concern is that if the Appropriation Refunding Bonds are validated "there would be no real restriction on balancing a biennial budget with debt," which "would open the floodgates to deficit financing." Although this concern is not unfounded, our role here is limited to interpreting the language of the

---

**6.** The parties also dispute the type of "obligation" required for the State to incur public debt as well as whether the bonds are "payable directly in whole or in part from a tax of state wide application on any class of property, income, transaction or privilege." Minn. Const. art. XI, § 4. These arguments go to the definition of "public debt" in Article XI, Section 4. We need not address these arguments, however, because we conclude, as a threshold matter, that the State has not pledged its "full

faith, credit and taxing powers" to the Appropriation Refunding Bonds under Article XI, Section 4. And because we conclude that the bonds are not public debt subject to the limitations in Article XI, Section 5, we do not address the Commissioner's alternative argument that even if the bonds do constitute public debt, the bonds are permissible debt because the constitution allows public debt to be contracted "to refund outstanding bonds of the state." *Id.* § 5(d).

constitution. *See Rice v. Connolly,* 488 N.W.2d 241, 248 (Minn.1992) (refusing to consider extrinsic factors when analyzing a constitutional provision because "we cannot ignore our own mandate—to refrain from expansive interpretation ... of the language of [a] constitutional provision"); *Visina v. Freeman,* 252 Minn. 177, 194, 89 N.W.2d 635, 649 (1958) (stating that "the right to amend the constitution rests with the people and should not be usurped by the courts in the guise of judicial interpretation" in order to achieve a desired result). The wisdom of issuing Appropriation Refunding Bonds is a public policy matter for the other branches of state government.

We conclude that under the plain language of Article XI, Section 4, the Appropriation Refunding Bonds do not constitute public debt for which the State has pledged its full faith, credit, and taxing powers. Accordingly, the bonds are not subject to the constitutional restrictions in Article XI, Section 5.

Constitutional question answered.

WRIGHT, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

ANDERSON, PAUL H., Justice (concurring in part, dissenting in part).

I respectfully concur in part and dissent in part. I agree with the majority that, although it is a close question, we do have jurisdiction to decide the limited question of the constitutionality of these Appropriation Refunding Bonds under Article XI, Sections 4 and 5, of the Minnesota Constitution. Therefore I concur in Part I of the majority's decision. But I conclude that the proposed Appropriation Refunding Bonds are public debt under Article XI, Section 4, because they will be repaid, in whole or in part, from tax revenues. Therefore, I dissent with respect to Part II of the majority's decision and join the dissent of Justice Page on this point.

PAGE, Justice (dissenting).

I respectfully dissent. Because the Commissioner of the Department of Management and Budget has not and, indeed, need not, issue the proposed tobacco appropriation bonds in question, any opinion this court renders on their constitutionality will be advisory. As a court, we do not issue advisory opinions. I therefore conclude that the issues before us are not justiciable. I also conclude that the court has it wrong when it concludes that the proposed bonds are not public debt and, therefore, are not subject to Article XI, Section 5, of the Minnesota Constitution.

*Justiciability.* I dissent from the court's conclusion that this case is justiciable, at least to the extent of deciding the constitutionality of issuing the proposed bonds. None of the proposed bonds have yet been issued. Moreover, nothing requires the Commissioner to issue the bonds, even with this court's blessing. As a result, this case calls for us to issue an advisory opinion based on hypothetical facts. Just last year we again observed: "We do not issue advisory opinions, nor do we decide cases merely to establish precedent." *McCaughtry v. City of Red Wing,* 808 N.W.2d 331, 337 (Minn.2011) (quoting *Jasper v. Comm'r of Pub. Safety,* 642 N.W.2d 435, 439 (Minn.2002) (internal quotation marks omitted)). Yet, if this proposed series of bonds is not issued, and it is not at all clear that they will be, precedent is all we will have established. I

would therefore dismiss the Commissioner's petition as not justiciable.

*Public debt.* I also dissent from the court's conclusion on the merits, namely, that the issuance of the proposed bonds would not violate Article XI of the Minnesota Constitution.

The court reads Section 4 to make the pledge of the State's "full faith, credit and taxing powers" a necessary condition for a debt to be "public." Minn. Const. art. XI, § 4. In other words, in the view of the court, if the State's full faith, credit, and taxing powers are *not* pledged, the debt is not "public." But under Minn.Stat. § 645.44, subd. 15 (2010), we are to read "may" as permissive. I therefore read Section 4 of Article XI to provide that the State "*may* contract public debts," for *some* of which (but not necessarily *all* of which) the State's full faith, credit, and taxing powers are pledged. Minn. Const. art. XI, § 4 (emphasis added). Put another way, I do not read Article XI, Section 4, to bar the State from issuing "public debt" for which the State's full faith, credit, and taxing powers have not been pledged. My reading is confirmed by Section 7 of Article XI, which requires the state auditor to

levy taxes sufficient to meet debt service on public debt "[w]hen the full faith and credit of the state has been pledged." *Id.* § 7. If public debt was always backed by the State's full faith and credit, Section 7 would not need the qualifier "[*w*]*hen* the full faith and credit of the state has been pledged." *Id.* (emphasis added). Thus, the court's conclusion that the State's full faith and credit must be pledged in order for a debt to be public is simply wrong.

Therefore, answering the question of whether the State's full faith and credit will be pledged to the proposed bonds here does not end the inquiry. Rather, the critical question is whether the bonds, if issued, would constitute "public debt." Because the proposed bonds fall within the plain definition of "public debt" under Article XI, Section 4, the issuance of the bonds for a purpose not enumerated in Article XI, Section 5, would violate the constitution.[1]

Article XI, Section 4, of the Minnesota Constitution provides:

> The state may contract public debts for which its full faith, credit and taxing powers may be pledged at the times and in the manner authorized by law, but

---

1. I note that the undisputed facts of the case confirm that the market already views the proposed bonds as public debt that is backed by the full faith and credit of the State. The 2011 tobacco settlement revenue bonds to be refinanced by the proposed appropriation bonds carry an interest rate of 4.79% and a rating of A/A− (by Standard & Poors) and a rating of BBB+ (by Fitch). By comparison, the general obligation bonds issued in September 2011 carry an interest rate of 2.823% and a rating of Aa1 (by Moody's), AA+ (by Standard & Poors), and AA+ (by Fitch). In other words, the bond markets view the 2011 tobacco settlement revenue bonds as *significantly* more risky than the State's general obligation bonds, *even though* the tobacco settlement revenue bonds are backed by a stream of settlement payments to be made by the tobacco companies.

In contrast, the Commissioner estimates that the proposed general fund appropriation refunding bonds will be issued at an interest rate of approximately 3.27% and will carry a rating in the A+ to AA range. For bonds with respect to which, according to the Commissioner, the State is obligated to pay not one whit, a lower interest rate and high rating amount to a remarkable showing of faith by the bond market. I suspect that the bond market knows what the court refuses to admit, namely, that the only thing likely to prevent the Legislature from appropriating funds necessary for debt service on these bonds is the end of the world as we know it. And because the Legislature will appropriate the funds necessary for debt service on these bonds from the State's general fund, there is no difference between these bonds and debt the court itself considers "public."

only for the purposes and subject to the conditions stated in section 5. *Public debt includes any obligation payable directly in whole or in part from a tax of state wide application on any class of property, income, transaction or privilege,* but does not include any obligation which is payable from revenues other than taxes.

*Id.* § 4 (emphasis added).

Section 5 of Article XI sets forth the following purposes for which public debt may be contracted.

(a) to acquire and to better public land and buildings and other public improvements of a capital nature and to provide money to be appropriated or loaned to any agency or political subdivision of the state for such purposes if the law authorizing the debt is adopted by the vote of at least three-fifths of the members of each house of the legislature;

(b) to repel invasion or suppress insurrection;

(c) to borrow temporarily as authorized in section 6;

(d) to refund outstanding bonds of the state or any of its agencies whether or not the full faith and credit of the state has been pledged for the payment of the bonds;

(e) to establish and maintain highways subject to the limitations of article XIV;

(f) to promote forestation and prevent and abate forest fires, including the compulsory clearing and improving of wild lands whether public or private;

(g) to construct, improve and operate airports and other air navigation facilities;

(h) to develop the state's agricultural resources by extending credit on real estate security in the manner and on the terms and conditions prescribed by law;

(i) to improve and rehabilitate railroad rights-of-way and other rail facilities whether public or private, provided that bonds issued and unpaid shall not at any time exceed $200,000,000 par value; and

(j) as otherwise authorized in this constitution.

*Id.* § 5.

Minnesota Statutes § 16A.99, subd. 8 (Supp.2011), provides: "The amount needed to pay principal and interest on appropriation bonds issued under this section is appropriated each year to the commissioner from the general fund...." And where does the money in the general fund come from? As the Official Statement with respect to the proposed bonds admits: "The General Fund is comprised of numerous revenue sources, *including tax revenues*...." (Emphasis added.) There can be no serious question that tax revenues include taxes of "state wide application on any class of property, income, transaction or privilege." *See* Minn. Const. art. XI, § 4. In sum, then, principal and interest on the proposed appropriation bonds will necessarily be paid, at least "in part," from tax revenues. *Id.* That means that under the plain language of Article XI, Section 4, the proposed bonds are "public debt." It is undisputed that the uses to which the proceeds of the proposed bonds will be put—"public purposes" amounting to balancing the State's budget—are not among the purposes for which Article XI, Section 5, authorizes the State to issue public debt. Thus, there can be no dispute that, if issued, the proposed bonds would violate Article XI. Because these bonds, if issued, constitute public debt that do not fit within any exception found in Article XI, Section 5, of the Minnesota Constitution, they would not only violate Article XI of the

Minnesota Constitution, they would eviscerate the State's balanced budget requirement.

Finally, I am compelled to address the court's assertion, made with respect to the Attorney General's balanced-budget argument, that "[t]he wisdom of issuing Appropriation Refunding Bonds is a public policy matter for the other branches of state government." Were the court writing on a blank slate, the assertion would no doubt have merit. But the slate before us is not blank. Rather, the issuance of these appropriation bonds implicates provisions of Article XI of the Minnesota Constitution, and that fact alone takes this dispute out of the realms of both policy and politics. *See State v. Osterloh,* 275 N.W.2d 578, 579–80 (Minn.1978) (stating that "the final interpretive body as to constitutional matters" is the courts). Had the framers of our constitution intended to leave the "wisdom" of incurring public debt solely to the Executive and Legislative Branches, there would be no balanced budget requirement.

But the framers did not leave it to the wisdom of the Executive and Legislative Branches. Rather, the framers limited the ability of those branches to incur public debt and empowered us to enforce those limits. To relegate this dispute to one over mere politics is therefore to denigrate the role of this court. We are called upon, as the court notes, to interpret a provision of the Minnesota Constitution. It is a role we should accept, here and now, not abdicate to future iterations of the other branches of state government.

I therefore respectfully dissent.