STATE OF MINNESOTA

IN SUPREME COURT

A22-0118

Court of Appeals                                                      Chutich, J.
                                                    Dissenting, Hudson, C.J.
                                                 Took no part, Procaccini, J.

Alejandro Cruz-Guzman, as guardian
and next friend of his minor children, et al.,

                Appellants,

vs.                                                          Filed: December 13, 2023
                                                        Office of Appellate Courts

State of Minnesota, et al.,

                Respondents,


Higher Ground Academy, et al., intervenors,

                Respondents.


_____


Daniel R. Shulman, Shulman & Buske PLLC, Minneapolis, Minnesota; and

Richard C. Landon, Lathrop GPM LLP, Minneapolis, Minnesota; and

Mel. C. Orchard, III, The Spence Law Firm, LLC, Jackson, Wyoming; and

James Cook, Law Offices of John Burris, Oakland, California, for appellants.

Keith Ellison, Attorney General, Liz Kramer, Solicitor General, Kevin Finnerty, Assistant Attorney General, Saint Paul, Minnesota, for respondents State of Minnesota, et al.

Jack Y. Perry, Brayanna J. Bergstrom, Taft Stettinius & Hollister LLP, Minneapolis, Minnesota; and

John Cairns, John Cairns Law, P.A., Minneapolis, Minnesota; and

Nekima Levy-Armstrong, Minneapolis, Minnesota, for respondents Higher Ground Academy, et al.

Andrew J. Pieper, John T. Katuska, Brea L. Khwaja, Stoel Rives LLP, Minneapolis, Minnesota; and

Teresa Nelson, David P. McKinney, American Civil Liberties Union of Minnesota, Minneapolis, Minnesota, for amici curiae American Civil Liberties Union and American Civil Liberties Union of Minnesota.

Michael V. Ciresi, Roberta B. Walburn, Patrick (Gus) Cochran, Ciresi Conlin LLP, Minneapolis, Minnesota, for amicus curiae Ciresi Walburn Foundation.

Mark R. Bradford, Elizabeth J. Roff, Bradford, Andresen, Norrie & Camarotto, Bloomington, Minnesota, for amici curiae Ed-Allies, Northside Achievement Zone, Project Restore MN, National Parents Union, Coalition of Asian American Leaders, Great MN Schools, Voices for Racial Justice, and Marquita Stephens.

Berglind Halldorsdottir Birkland, Debevoise & Plimpton LLP, New York, New York, for amici curiae Education Law Center and the Constitutional and Education Law Scholars.

Will Stancil, Minneapolis, Minnesota, for amici curiae Minnesota Law Professors.

_____

S Y L L A B U S

1.      The certified question from the district court is reformulated to read as follows:  Are racial imbalances in Minneapolis and Saint Paul public schools, as compared to other schools in the same school district, sufficient, standing alone, to establish a violation of the Education Clause of the Minnesota Constitution?

2.      Racial imbalances in Minneapolis and Saint Paul public schools, as compared to other schools in the same school district, are not sufficient, standing alone, to

2

establish a violation of the Education Clause of the Minnesota Constitution, Minn. Const. art. XIII, § 1.

3.    To prevail on a claim alleging a violation of the Education Clause of the Minnesota Constitution based on racial imbalances in Minneapolis and Saint Paul public schools, appellants do not need to establish that state action caused the racial imbalances; they do need to establish, however, that the racial imbalances are a substantial factor in causing their children to receive an inadequate education.

Certified question, as reformulated, answered in the negative.

Remanded.

O P I N I O N

CHUTICH, Justice.

In 2015, appellants Alejandro Cruz-Guzman, et al., ("the parents") brought a class action lawsuit on behalf of children enrolled in Minneapolis and Saint Paul public schools. According to the parents, their "claims all arise from racial and socioeconomic segregation" in the public schools "for which they allege the State is responsible." Among other claims, they assert that racially segregated schools violate their children's right to an adequate education under the Education Clause of the Minnesota Constitution, Minn. Const. art. XIII, § 1.

Following years of litigation and appeals, including a prior decision by our court holding that the claims are justiciable, *Cruz-Guzman v. State* (*Cruz-Guzman I*), 916 N.W.2d 1 (Minn. 2018), as well as unsuccessful efforts to settle the claims, the district court denied the parents' motion for partial summary judgment on their claim under the

Education Clause. But the district court certified a question for immediate appeal, asking whether racial imbalances in Minneapolis and Saint Paul public schools are sufficient, standing alone, to establish a violation of the Education Clause.[1] Answering the certified question, the court of appeals held that an imbalance in the racial composition of a school, "as compared to other schools in the same school district . . . is not a *per se* violation of the Education Clause of the Minnesota Constitution, unless the racial imbalance is caused by intentional, *de jure* segregation." *Cruz-Guzman v. State*, 980 N.W.2d 816, 820 (Minn. App. 2022). We granted the parents' petition for further review.

To better address the legal issues presented here, we reformulate the certified question as follows:

> Are racial imbalances in Minneapolis and Saint Paul public schools, as compared to other schools in the same school district, sufficient, standing alone, to establish a violation of the Education Clause of the Minnesota Constitution?

We hold that racial imbalances in Minneapolis and Saint Paul public schools, standing alone, are not sufficient to establish a violation of the Education Clause.[2] Although the

---

[1] The district court certified the following question: "Is the Education Clause of the Minnesota Constitution violated by a racially imbalanced school system, regardless of the presence of *de jure* segregation or proof of a causal link between the racial imbalance and the actions of the state?"

[2] When referring to the Minneapolis and Saint Paul public schools, we use the term racially "imbalanced," rather than racially "segregated," because the word "segregated" implies an intentional policy of racial separation or isolation. The use of the word "imbalanced" more accurately reflects the issue before us, which is premised on the existence of *de facto*, unintentional racial imbalances, rather than *de jure*, intentional segregation, in the schools.

parents do not have to establish that state action caused the racial imbalances, we hold that they must show that the racial imbalances are a substantial factor in causing their children to receive an inadequate education. We therefore answer the reformulated certified question in the negative and remand the matter to the district court for further proceedings.

**FACTS**

In November 2015, appellants Alejandro Cruz-Guzman, et al., ("the parents")[3] brought a putative class action lawsuit against the State of Minnesota, Minnesota Department of Education, Minnesota Commissioner of Education, Minnesota House of Representatives, and Minnesota Senate (collectively, "the State"). The parents allege that the State violated their children's rights under the following constitutional provisions: the Education Clause of the Minnesota Constitution, Article XIII, Section 1; the Equal Protection Clause of the Minnesota Constitution, Article I, Section 2; and the Due Process Clause of the Minnesota Constitution, Article I, Section 7. They sought to represent "a class of children enrolled, or expected to be enrolled during the pendency of this action, in the Minneapolis Public Schools, Special School District No. 1, and the Saint Paul Public Schools, Independent School District 625." The parents did not bring any direct claims

---

[3] Appellants include the following persons, as guardians and next friends of their minor children: Alejandro Cruz-Guzman, Me'Lea Connelly, Ke'Aundra Johnson, Izreal Muhammad, Roxxanne O'Brien, Diwin O'Neal Daley, and Lawrence Lee. Appellants also include One Family One Community, a Minnesota nonprofit corporation.

5

against either the Minneapolis Public Schools or the Saint Paul Public Schools. The district court later allowed a group of charter schools ("the Charter Schools")[4] to intervene.

***Allegations and claims***. This appeal involves the parents' claim under only the Education Clause of the Minnesota Constitution. The Education Clause provides that the Legislature has a duty "to establish a general and uniform system of public schools" and "make such provisions by taxation or otherwise as will secure a thorough and efficient system of public schools throughout the state." Minn. Const. art. XIII, § 1. Specifically, the parents contend that the existence of racially imbalanced public schools automatically means the Legislature has violated its duty to provide an adequate education to their children.

The complaint alleges a "high degree of segregation based on race" in Minneapolis and Saint Paul public schools. And the parents argue that there is substantial evidence of worsening segregation. For example, they produced evidence showing that for the 2020-21 school year, Minneapolis Public Schools had 23 schools with more than 80 percent students of color, but 12 schools with fewer than 40 percent students of color. For the same school year, Saint Paul Public Schools had 36 schools with at least 80 percent students of color, of which 28 had at least 90 percent students of color, but 5 schools with at least 53 percent white students.

---

[4] The three Minneapolis- and Saint Paul-based charter schools granted intervention are Higher Ground Academy, Friendship Academy of the Arts, and Paladin Career and Technical High School. Parents Rochelle LaVanier, Mohamed Abdilli, and Sharmaine Russell are listed as intervenor-respondents as well.

The complaint also alleges that these racially imbalanced schools have significantly worse outcomes across various academic measures compared to neighboring schools and school districts, which the parents describe as a "large and intractable achievement gap" between white students and students of color. The complaint further alleges other harms created by racially imbalanced schools, including the disproportionate likelihood that students will be placed in special education programs, the reduced likelihood of graduation, and decreased opportunities for interactions with students of other races, leading to reduced "intergroup competency as an adult." Based on these allegations, the parents claim that students attending racially imbalanced schools are not receiving an adequate education.

Finally, as highlighted by the district court's order denying the parents' motion for partial summary judgment, the complaint identifies the following State policies and practices that the parents allege contribute to the racial imbalances and inadequate educational outcomes:

- a 1999 Minnesota Department of Education desegregation rule that replaced an earlier 1978 desegregation rule;
- policies favoring neighborhood schools;
- charter school exemption from the desegregation rules;
- school boundary lines;
- suburban attendance boundaries;
- open enrollment;
- discipline and suspension policies;
- disparate funding of schools;
- formation of charter schools; and
- misuse of state and federal funds intended to support desegregation.

(Formatting and capitalization altered.)

7

In sum, the parents claim that the racial imbalances in Minneapolis and Saint Paul public schools prove that the Legislature has failed "to establish a general and uniform system of public schools" and "secure a thorough and efficient system of public schools" as mandated by the Minnesota Constitution. Minn. Const. art. XIII, § 1. Although the parents claim they have evidence of intent and causation, they ask us to hold that racially imbalanced schools are "sufficient to violate the Education Clause," without proof of intent or causation.

*Prior procedural history*. This appeal is the second time that we have reviewed legal issues in this case. Shortly after the parents filed their complaint in 2015, the State moved to dismiss on several grounds, including lack of jurisdiction under the Declaratory Judgments Act, failure to state a claim upon which relief can be granted, and failure to join all interested persons. The district court partially denied the State's motion to dismiss, and the State filed an interlocutory appeal, raising four issues, including lack of justiciability. *Cruz-Guzman v. State*, 892 N.W.2d 533, 536 (Minn. App. 2017). The court of appeals reversed, concluding that the parents' claims "present a nonjusticiable political question." *Id.* at 541.

We granted review and reversed the decision of the court of appeals. *Cruz-Guzman I*, 916 N.W.2d at 5. We held that "separation-of-powers principles do not prevent the judiciary from ruling on whether the Legislature has violated its duty under the Education Clause or violated the Equal Protection or Due Process Clauses of the Minnesota Constitution." *Id.* We also held that "the district court did not err when it denied the State's motion seeking to dismiss the complaint based on legislative immunity and the failure to

8

join necessary parties." *Id.* The case then returned to the district court for further proceedings.

The district court next granted the parents' class certification motion. The district court certified a class of all Minneapolis and Saint Paul public school children enrolled in a school that is "racially or socioeconomically imbalanced as defined herein: a school with less than 20% or more than 60% minority students or students eligible for free-or-reduced price meals."

Meanwhile, the parents and the State engaged in mediation over the next 2 years. The parties agreed upon and drafted a bill for the Legislature to consider in early 2021, which, if passed, would have resolved the lawsuit.[5] H.F. 2471, 92nd Minn. Leg. 2021; S.F. 2465, 92nd Minn. Leg. 2021 (H.F. 2471's identical companion bill). The bill, however, failed to pass either house of the Legislature and has not been reintroduced since 2021.

***Motion for partial summary judgment.*** After the bill failed to pass but before the close of discovery, the parents moved for partial summary judgment on their Education Clause claim. To support their motion, the parents relied heavily on the following language from a footnote in our decision in *Cruz-Guzman I*: "It is self-evident that a segregated system of public schools is not 'general,' 'uniform,' 'thorough,' or 'efficient.' "

---

[5] The bill proposed new policies and plans for school districts to help improve the academic outcomes and opportunities of "historically underserved students." H.F. 2471, 92nd Minn. Leg. 2021. The bill defined "[h]istorically underserved students" as "students of color, indigenous students, and students in poverty." *Id.* § 1, subd. 7. The bill also provided a model "to identify areas where students live in the most challenging environments," relying primarily on economic factors like home ownership and household income. *Id.* § 2(a).

916 N.W.2d at 10 n.6 (quoting Minn. Const. art. XIII, § 1). They asserted that this language, along with the constitutional mandate that the Legislature provide students with an adequate education, means that they need not prove that the State *intended* to cause the racial imbalances in Minneapolis and Saint Paul public schools. Instead, they argued that evidence of racially imbalanced public schools establishes a per se violation of the Education Clause, regardless of whether such imbalances are intentional. They further argued that they need not prove causation between the racially imbalanced public schools and the inadequate education their children allegedly receive.

To support their claim that the racial imbalances in Minneapolis and Saint Paul public schools harm their children, the parents provided the district court with recent statistics on academic outcomes. The data compared the proficiency of students of color with their white peers for certain subjects in Minneapolis and Saint Paul public schools and statewide.

For example, in their brief to our court, the parents stated that in Minneapolis Public Schools, only 25 percent of Black students, 30 percent of Hispanic students, and 24 percent of Native American students were proficient in reading in 2019—compared to 78 percent of their white peers in Minneapolis and 60 percent of students statewide. In Saint Paul Public Schools, only 25 percent of Black students, 30 percent of Hispanic students, and 32 percent of Native American students were proficient in reading in 2019—compared to 73 percent of their white peers in Saint Paul and 60 percent of students statewide. Evidence showed similar disparities in math and science proficiency. Citing these disparities, the

parents asserted "there can be no dispute" that the education provided to students of color in Minneapolis and Saint Paul public schools "has been inadequate."

The parents asked the district court to conclude that the State violated the Education Clause "by instituting, maintaining, permitting, and failing to correct public schools segregated by race and socioeconomic status in the Minneapolis and Saint Paul Public School Districts."[6] The parents also asked the district court for an order enjoining the State from further violations and to order the State to "provide a non-segregated general, uniform, thorough, and efficient system of public schools."

In opposing the parents' motion for partial summary judgment, the State asserted that (1) the parents have not established that the racial imbalances alone violate the Education Clause, without any evidence of intentional racial segregation; (2) the parents' positions are not supported by precedent and would lead to unworkable solutions that force courts to engage in educational policy-making; and (3) the parents have failed to show at this early stage of the litigation that the racial imbalances have *caused* students to receive an inadequate education. The State pointed out that the parents brought their motion before the exchange of expert reports and completion of discovery.

The Charter Schools also opposed the parents' motion and emphasized the importance of "open-enrollment policies" and "the exemption of charter schools from

---

[6] The parents' complaint, and their motion for partial summary judgment on their Education Clause claim, assert a violation of the Education Clause based on racial *and* socioeconomic segregation. As discussed below, the district court's certified question referenced only "a racially imbalanced school system." The issue of *socioeconomic* imbalance therefore is not before us.

particular desegregation efforts," which they describe as the "two pillars of 'parental choice.' "[7] They asserted that granting the parents' motion would cause the courts to engage in inappropriate, educational policymaking and prioritize racial and socioeconomic statistics over other valid education policies.

*District court order*. The district court denied the parents' motion for partial summary judgment. The district court described the parents' argument as "a syllogism"— that because *Cruz-Guzman I* said, "[i]t is self-evident that a segregated system of public schools is not 'general,' 'uniform,' 'thorough,' or 'efficient,' " and because public schools in Minneapolis and Saint Paul are segregated, therefore the parents have established an Education Clause violation.

The district court instead ruled that the parents must establish intentional segregation to prevail on their Education Clause claim. The district court also ruled that the parents "must establish that any challenged state action(s) must directly cause the racially imbalanced school environment." The court reasoned that any remedy for an Education Clause violation would require the reassignment of students to different schools based on race and that such a remedy is permitted under the United States Constitution

---

[7] In March 2019, the Charter Schools moved for summary judgment on their counter/crossclaim, seeking a declaration of the constitutionality of their exemption from certain desegregation efforts. *See* Minn. Stat. § 124D.861, subd. 1 (2022) (establishing the "Achievement and Integration for Minnesota" program to "pursue racial and economic integration and increase student academic achievement"); Minn. Stat. § 124E.03, subd. 1 (2022) (exempting charter schools "from all statutes and rules applicable to a school, school board, or school district unless a statute or rule is made specifically applicable to a charter school or is included in this chapter"). The district court denied summary judgment. That issue is not before us.

12

only for "intentional state-sponsored segregation." The district court determined, however, that the record is "wholly inadequate" to establish intentional segregation as "a matter of undisputed material fact."

In its order denying partial summary judgment, the district court also sought "appellate guidance," noting that there are "substantial and well-grounded differences of opinion" on these issues and citing "the strong possibility that requiring proof of intent [would] end these proceedings given the profound difficulty in successfully proving intent." The district court therefore certified the following question to the court of appeals as "important and doubtful" under Minnesota Rule of Civil Appellate Procedure 103.03(i):

> Is the Education Clause of the Minnesota Constitution violated by a racially imbalanced school system, regardless of the presence of *de jure* segregation or proof of a causal link between the racial imbalance and the actions of the state?

***Court of appeals decision***. After concluding that the certified question is important and doubtful, the court of appeals held that a racially imbalanced school system caused by unintentional segregation is not, by itself, a violation of the Education Clause, "even if state action contributed to the racial imbalance." *Cruz-Guzman*, 980 N.W.2d at 822, 827. Rather, the court of appeals determined that a per se violation of the Education Clause exists only if the racial imbalance is caused by intentional segregation of the type described by the Supreme Court in *Brown v. Board of Education*, 347 U.S. 483 (1954). *Cruz-Guzman*, 980 N.W.2d at 827.

The parents petitioned for further review, asking us to provide guidance on "the standard by which a plaintiff must prove that racial segregation in a school system violates

the Education Clause" and to "clarify how such a claim should proceed." We granted the petition.

## ANALYSIS

An interlocutory appeal may be taken if the district court "certifies that the question presented is important and doubtful . . . from an order which denies a motion for summary judgment." Minn. R. Civ. App. P. 103.03(i). Certified questions are questions of law that we review de novo. *Siewert v. N. States Power Co.*, 793 N.W.2d 272, 277 (Minn. 2011). We also review questions of constitutional interpretation de novo. *Shefa v. Ellison*, 968 N.W.2d 818, 825 (Minn. 2022).

### I.

We first address the formulation of the certified question. The district court certified the following question to the court of appeals as important and doubtful:

> Is the Education Clause of the Minnesota Constitution violated by a racially imbalanced school system, regardless of the presence of *de jure* segregation or proof of a causal link between the racial imbalance and the actions of the state?

The parties do not dispute that this question is important and doubtful under Rule 103.03(i), and we agree. Still, we may reformulate a certified question to present an important issue "clearly and concisely" and to further our "policy of answering certified questions with an unqualified yes or no." *Minn. Citizens Concerned for Life, Inc. v. Kelley*, 698 N.W.2d 424, 430 (Minn. 2005) (reformulating a certified question from the Eighth Circuit).

14

The district court's certified question has several parts, which makes it difficult for us to give an unqualified yes or no answer. Accordingly, we choose to reformulate the certified question as follows:

> Are racial imbalances in Minneapolis and Saint Paul public schools, as compared to other schools in the same school district, sufficient, standing alone, to establish a violation of the Education Clause of the Minnesota Constitution?

Reformulating the question, as discussed below, allows us to answer it with an unqualified "no" and better address the key issues presented here. And framing the question in terms of racial imbalances in Minneapolis and Saint Paul public schools is consistent with the class certified by the district court, which was limited to Minneapolis and Saint Paul public school children, as well as the parents' specific allegations, which focus on racial imbalances in Minneapolis and Saint Paul public schools as compared to other schools in the same school district. The parents do not challenge or request a remedy for any racial imbalances that may exist in other school districts in other areas of the state.[8] Finally, the reformulated question allows us to provide more helpful guidance as this case proceeds on remand, because the parties' positions have evolved on appeal.

---

[8]     The parents have compared the racial imbalances and achievement gaps in Minneapolis and Saint Paul public schools to public schools in suburban school districts. But as noted, the parents' definition of "segregation" focuses on comparisons between the population of students in a particular school and "the district as a whole." Our wording of the certified question, however, does not dictate how this case will be litigated on remand.

15

II.

Answering the reformulated question requires us to interpret and apply the Education Clause of the Minnesota Constitution, Minn. Const. art. XIII, § 1. The parents ask us to hold that racial imbalances in Minneapolis and Saint Paul public schools, as compared to other schools in the same school district, are sufficient, standing alone, to establish a violation of the Education Clause.

Our constitutional analysis begins with the language of the Education Clause. The Education Clause provides:

> The stability of a republican form of government depending mainly upon the intelligence of the people, it is the duty of the legislature to establish a general and uniform system of public schools. The legislature shall make such provisions by taxation or otherwise as will secure a thorough and efficient system of public schools throughout the state.

Minn. Const. art. XIII, § 1. The Education Clause frames the duty of the Legislature in broad terms—establishing a "general and uniform system of public schools" and securing "a thorough and efficient system of public schools." *Id.* The original drafters purposefully left the details of state education policy to the Legislature. *See* T.F. Andrews, rep., *Debates and Proceedings of the Constitutional Convention for the Territory of Minnesota* 233–34 (George W. Moore, printer, 1858) (explaining that the drafters wanted to "make one or two general provisions" regarding education and leave "the minutia of this matter . . . with the Legislature").

"[W]e have not had many occasions to interpret or apply the Education Clause." *Cruz-Guzman I*, 916 N.W.2d at 8. In our earliest case, decided over 150 years ago, we stated that the object of the Education Clause "is to ensure a regular method throughout the

16

state, whereby all may be enabled to acquire an education which will fit them to discharge intelligently their duties as citizens of the republic." *Bd. of Educ. of Sauk Ctr. v. Moore*, 17 Minn. 412, 416 (1871). We later described this constitutional provision as a "mandate" to the Legislature. *State ex rel. Klimek v. Sch. Dist. No. 70*, 283 N.W. 397, 398 (Minn. 1939).

Notwithstanding a strong "local interest" in education, *Bd. of Educ. of Minneapolis v. Houghton*, 233 N.W. 834, 835 (Minn. 1930), we have explained that the Minnesota Constitution "turned the whole subject" of education "over to the Legislature." *State ex rel. Smith v. City of St. Paul*, 150 N.W. 389, 391 (Minn. 1914) (citation omitted) (internal quotation marks omitted). Consequently, the Legislature possesses "almost unlimited power over all matters relating to public schools." *Houghton*, 233 N.W. at 835. Although Minnesota school districts may decide many local policy matters, the school districts are "always under the control of the Legislature." *Kramer v. Renville County*, 175 N.W. 101, 101–02 (Minn. 1919); *see also State ex rel. Smith*, 150 N.W. at 391 (noting that the Legislature provided for school districts because the Legislature is unable to fulfill its constitutional duty "directly"). The powers exercised by local school districts are delegated powers, which the Legislature may modify or abrogate "to any extent that it may see fit." *Kramer*, 175 N.W. at 101–02.

More recently, we have held that education is "a fundamental right under the state constitution, not only because of its overall importance to the state but also because of the explicit language used to describe this constitutional mandate." *Skeen v. State*, 505 N.W.2d 299, 313 (Minn. 1993). In *Cruz-Guzman I*, we recognized that this fundamental right is

not "merely a right to anything that might be labeled as 'education,' but rather, a right to a general and uniform system of education that is thorough and efficient, that is supported by sufficient and uniform funding, and that provides an adequate education to all students in Minnesota." 916 N.W.2d at 11. We also recognized that "some level of qualitative assessment is necessary to determine whether the State is meeting its obligation to provide an adequate education." *Id.* at 12.

Relying on this case law delineating the broad scope of the Legislature's mandate under the Education Clause, the parents argue that racially imbalanced public schools are a per se violation of the Legislature's duty to provide an adequate education. The parents focus on our decision in *Cruz-Guzman I*, primarily on one footnote, which reads:

> The dissent concedes that a claim of segregated schools is justiciable, but maintains that appellants' claims are not "traditional" segregation claims and therefore the claims are not justiciable. *It is self-evident that a segregated system of public schools is not "general," "uniform," "thorough," or "efficient."* Minn. Const. art. XIII, § 1. Regardless of whether the context is a "traditional" segregation claim or a different type of claim, courts are well equipped to decide whether a school system is segregated, and have made such determinations since *Brown,* 347 U.S. at 495.

*Cruz-Guzman I*, 916 N.W.2d at 10–11 n.6 (emphasis added). The parents assert that this language—in particular our statement that "a segregated system of public schools is not 'general,' 'uniform,' 'thorough,' or 'efficient' "—clearly supports their position that racial imbalances in public schools are a per se violation of the Education Clause. They argue that children in a pluralistic society cannot "discharge intelligently their duties as citizens of the republic," *Bd. of Educ. of Sauk Ctr.*, 17 Minn. at 416, if they are isolated from entire communities of their peers. So, according to the parents, we effectively held in

*Cruz-Guzman I* that intent and causation are irrelevant under the Education Clause if a plaintiff can prove that a public school system is racially imbalanced.  The State argues that the parents overstate the meaning of the footnote.

This statement in a footnote in *Cruz-Guzman I*—"that a segregated system of public schools is not 'general,' 'uniform,' 'thorough,' or 'efficient,' " 916 N.W.2d at 10 n.6— when considered in the context of the footnote and opinion as a whole, does not bear the weight the parents place upon it.  First, our opinion was primarily concerned with the justiciability of the parents' claims.  *Id.* at 8–12.  And the footnote was in the section of the opinion discussing the justiciability of the *due process and equal protection claims*, citing *Brown v. Board of Education*, 347 U.S. at 495, for the well-known proposition that "[c]laims based on racial segregation in education are indisputably justiciable."  *Cruz-Guzman I*, 916 N.W.2d at 10.  The footnote made the point, in response to the dissent, that a segregation claim is justiciable whether brought under the Equal Protection Clause (a "traditional" segregation claim) or under the Education Clause (a nontraditional claim).  *Id.* at 10–11 n.6.  We did not—in a single sentence in a footnote of an opinion addressing justiciability—designate unintentional racial imbalances in public schools as a per se violation of the Legislature's duty under the Education Clause without further explanation. Because the footnote does not hold the power the parents suggest, it does not control our answer to the certified question.[9]

---

[9]    The parents and several amici also encourage us to follow the decisions of other state supreme courts that have adopted expansive readings of their state constitutions to conclude that the state has an affirmative responsibility to remedy de facto segregation in

III.

Because our decision in *Cruz-Guzman I* does not control our answer to the reformulated question, we next address the parties' arguments about the elements of the parents' Education Clause claim. In the district court, the parties disputed the role of intent and causation. The parents argued that they do not need to prove either intent or causation to prevail on their Education Clause claim. They contend here that because the Education Clause grants Minnesota students the right to an adequate education, the provision supports a holding that racial imbalances in Minneapolis and Saint Paul public schools—without explicit proof of intent or causation—establish a per se violation. In the district court, the State challenged the parents' analysis, arguing that they must establish both intent and causation. But the State's position changed on appeal. Generally, the State now takes the position that "neither traditional notions of causation nor intent are well suited to this unique constitutional claim."

---

the public schools. *See Sheff v. O'Neill*, 678 A.2d 1267, 1283 (Conn. 1996) (concluding that the legislature has an "affirmative responsibility to remedy segregation" in the public schools, regardless of whether the segregation is de jure or de facto); *In re Petition for Authorization to Conduct a Referendum on the Withdrawal of N. Haledon Sch. Dist. from the Passaic Cnty. Manchester Reg'l High Sch. Dist.*, 854 A.2d 327, 336, 339 (N.J. 2004) (noting that the court has consistently "held that racial imbalance resulting from *de facto* segregation is inimical to the constitutional guarantee of a thorough and efficient education" and recognizing a "constitutional imperative to prevent segregation").

Because the language of the Minnesota Constitution differs greatly from the language of these other state constitutions, which *explicitly* prohibit segregation, we find these cases unpersuasive. *See* Conn. Const. art. I, § 20 (providing that no person shall be "subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability"); N.J. Const. art. I, ¶ 5 (providing that no person shall be segregated "in the public schools, because of religious principles, race, color, ancestry or national origin").

20

A.

As an initial matter, we decline to make any ruling on intent—whether the parents must establish an intentional violation of the Education Clause—because it is no longer a disputed issue. In the district court, the parties debated whether the parents must establish an intentional violation of the Education Clause. The district court determined that it would "not impose an intent requirement" at this stage "without further guidance from the appellate courts."[10] In the court of appeals, the State conceded that the Education Clause does not contain an intent requirement. In our court, the State does not specifically argue that intent is required. The element of intent, therefore, is not properly before us. *See Schowalter v. State*, 822 N.W.2d 292, 299 (Minn. 2012) (explaining that a justiciable controversy requires "a genuine conflict in tangible interests between adverse parties").

---

[10] The district court did conclude, however, that intentional segregation "must be established before an Education Clause violation can be found." The district court, the court of appeals, and the parties all agree that the existence of intentional racial segregation violates the Legislature's duty under the Education Clause. The court of appeals held that "proof of a racial imbalance among schools within a school district or school system due to intentional, *de jure* segregation" is "*sufficient* to establish a violation of the Education Clause." *Cruz-Guzman*, 980 N.W.2d at 826 (emphasis in original). Because none of the parties have challenged that conclusion, the legal consequences of intentional racial segregation are not properly before us. And although the parents argue that they have evidence of intentional racial segregation, any assessment of that evidence is also not properly before us. The parents claim that they have demonstrated intent based on the change in the Minnesota Department of Education's desegregation policies from the mid-1990s until 2015. They claim that the State knew that the change would result in resegregation. But the district court concluded that the "factual record is wholly inadequate to establish" intentional segregation "as a matter of undisputed material fact." At oral argument, the parents conceded that the sufficiency and strength of their evidence of intentional segregation is not properly before us.

21

Based on the State's concession, the parents on remand can establish a violation of the Education Clause without showing that the State intended to violate the Clause.

B.

We turn next to causation. Two issues of causation are posed here. First, whether a violation of the Education Clause premised on racial imbalances requires proof that the State caused the racial imbalances in the schools. Second, whether the parents must establish that the racial imbalances caused their children to receive an inadequate education.

1.

As a threshold matter, we stress that answering the reformulated question does not require us to define the contours of an adequate education under the Education Clause. When the district court certified the question to the court of appeals, discovery was ongoing, and the parties had not exchanged expert reports. In fact, the district court noted that the parents' motion for partial summary judgment had "*not* advanced their theory, still present in their pleadings, that racially imbalanced schools result in such poor academic outcomes that they violate the state's Education Clause." The State asserts that it intends on remand "to propose a set of constitutional requirements for establishing a general and uniform system that provides students with the opportunity to receive an adequate education." Accordingly, the issue of whether the students are receiving an adequate education is not properly before us, and we express no opinion on that issue.

2.

On the first causation issue, whether a violation of the Education Clause premised on racial imbalances requires proof that the State caused the racial imbalances in the schools, the district court ruled that "an Education Clause violation must establish that any challenged state action(s) must *directly cause* the racially imbalanced school environment." (emphasis added).  The court of appeals did not address causation.

The parents argue that the district court erred by imposing a "direct cause" standard. The parents believe that racial imbalances in the schools are sufficient, standing alone, to establish an Education Clause violation.  The State, on the other hand, references the "[u]sual principles of standing" and asserts that the parents must demonstrate an injury that is traceable to an action of the State that the State can redress.  *See Garcia-Mendoza v. 2003 Chevy Tahoe*, 852 N.W.2d 659, 663 (Minn. 2014).  According to the State, any liability under the Education Clause should "be limited to issues over which the legislature has control."  The State emphasizes the word "system" in the Education Clause, Minn. Const. art. XIII, § 1, arguing that the Legislature's mandate under the Education Clause "refers to statewide characteristics of the education program" and does not extend to policy matters carried out "on the district or smaller level."  The State also asserts that the parents presented no evidence that its actions directly caused the racial imbalances at issue here.

The State suggests that the Legislature is not responsible for—and therefore not required to remedy—an inadequate education caused by policies adopted at the local, school district, as opposed to the state, level.  We disagree.  As explained above, the "maintenance of public schools has always been a matter of state, as distinguished from

23

local concern." *State ex rel. Smith*, 150 N.W. at 391. In other words, "education is a duty and responsibility imposed upon the *state*." *Kronschnabel v. City of St. Paul*, 137 N.W.2d 200, 202 (Minn. 1965) (emphasis added). The Legislature may delegate certain tasks and functions to local school districts, but "the ultimate responsibility for fulfilling the legislature's *constitutional* duty cannot be delegated" to the Minneapolis and Saint Paul school districts. *See Zeyen v. Pocatello/Chubbuck Sch. Dist. No. 25*, 451 P.3d 25, 33 (Idaho 2019) (emphasis added) (internal quotation marks omitted) (quoting *Osmunson v. State*, 17 P.3d 236, 240 (Idaho 2000)) (addressing the Idaho Legislature's constitutional obligation to establish and maintain a general, uniform, and thorough system of public schools).

The Legislature is responsible for establishing a general and uniform system that provides students with the opportunity to receive an adequate education. If that standard is not met, a claim may be brought under the Education Clause to compel the State to comply with its constitutional charge. The State need not have directly caused the deficiency to be obligated to remedy it under the Education Clause. We therefore reject the district court's ruling that to prevail on their Education Clause claim, the parents must establish that the State's actions directly caused the challenged racial imbalances.

3.

In their petition for review, the parents raised a second causation issue: "[W]hat standard of causation is required to prove a racially segregated school system violates the Education Clause[?]" The parents acknowledge that the district court focused on whether they must establish that the challenged state actions caused the racially imbalanced schools,

and neither the district court nor the court of appeals decided whether they need to show that the racially imbalanced schools caused their children to receive an inadequate education. But the parents ask us to decide this issue now because the parties and the district court will need guidance on remand "on the nature of the requisite causation."

Although we typically decline to decide issues not reached by the courts below, here causation is a novel legal issue subject to de novo review, it was briefed in the district court and on appeal, the district court will need to address it on remand, and the parents have been litigating their Education Clause claim for nearly 8 years. Accordingly, we reach causation in the interests of judicial economy and to provide guidance on remand. *See McGuire v. Bowlin*, 932 N.W.2d 819, 828 (Minn. 2019) (resolving a question of law not addressed by the district court or the court of appeals in the interests of judicial economy); *J.E.B. v Danks*, 785 N.W.2d 741, 751 (Minn. 2010) (addressing an alternative issue specifically "to provide guidance on remand").

The parties and the amici disagree on whether causation is a required element of the parents' Education Clause claim and, if so, what causation standard applies. Although the State maintains that "traditional notions of causation" are not "well suited" to an Education Clause claim, the State argues that the parents cannot prevail without first showing that racial imbalances deny students the opportunity to receive an adequate education. The Charter Schools contend that the parents must establish that the racial imbalances are "contributing" factors or "causally related" to the alleged inadequate education. The Charter Schools maintain that their own "segregated" and "hyper-segregated" schools—some publicly recognized for their excellent academic performance—prove that racial

25

imbalances, without more, do not automatically result in an inadequate education. But the parents argue that they do not need to establish causation.

The parents and some of the amici discuss causation in the abstract. They claim that proof that the parents' children receive an inadequate education, regardless of causation, establishes a per se violation of the Legislature's duty under the Education Clause. But we do not decide causation in the abstract. We decide causation in the context of a specific claim premised on specific allegations. Because the parents' Education Clause claim is specifically premised on the existence of racial imbalances in Minneapolis and Saint Paul public schools, the parents necessarily must establish a causal connection between the racial imbalances and the inadequate education their children allegedly receive.

The dissent agrees with the parents that racial imbalances in schools are sufficient, standing alone, to establish an Education Clause violation. The dissent discusses "the historical entanglement of the State with the rise of de facto segregation in the Twin Cities" and concludes that "racially segregated neighborhoods" have resulted in "racialized disparities in academic outcomes." The dissent supports this conclusion with statistics and studies and scholarship, as well as "the robust record in this case." But these matters have not been fully developed in the district court. Discovery has not concluded, and the parties have not identified any expert witnesses or produced any expert reports.

The district court explained that the parents' motion for partial summary judgment had "*not* advanced their theory," which was "present in their pleadings, that racially imbalanced schools result in such poor academic outcomes that they violate the state's Education Clause." Instead, the parents' motion was based on their "theory that the

26

existence of racial imbalance alone violates the Education Clause—regardless of any effect on academic outcomes" or "the State's role in creating the imbalance." According to the State, the parents "did not produce evidence" that the racial imbalances caused an inadequate education as "they claimed it was unnecessary to do so." Because the district court will resolve the Education Clause claim on remand with the benefit of a full evidentiary record, it would be premature for us to express our views on this issue. *See In re McCaskill*, 603 N.W.2d 326, 327 (Minn. 1999) (noting that appellate courts "avoid advisory opinions").

The dissent also contends that we improperly graft a causation element onto the Education Clause. But our holding on causation is narrow and focused on the present case. We reject the parents' argument that the district court may order the Legislature to remedy the racial imbalances in the public schools without any showing that the racial imbalances are causally related to the constitutionally inadequate education their children allegedly receive. *See Cruz-Guzman I*, 916 N.W.2d at 8–12 (recognizing that "matters of educational policy" fall under the constitutional authority of the Legislature and the judiciary's role is limited to assessing "whether constitutional requirements have been met").

We next address the applicable causation standard. Although the parents argue that causation is not a required element of their Education Clause claim, alternatively they maintain that "proximate cause is the appropriate standard." In fact, at oral argument, counsel for the parents conceded that the parents would consent to the causation standard that we announce today. Under our proximate cause standard, the conduct or action must

be "a substantial factor in bringing about the injury." *Flom v. Flom*, 291 N.W.2d 914, 917 (Minn. 1980). We agree with the parents that, for a claim like this, with potentially many different causes of the alleged inadequate education—factors that may include racial imbalances—a "substantial factor" standard is appropriate. The substantial factor standard recognizes the complexities and nuances of providing an adequate education. We therefore hold that to succeed on their Education Clause claim, the parents must prove that the racial imbalances are a substantial factor in causing an inadequate education.

IV.

As a final matter, because the parties have discussed remedies and this issue was a concern for the district court, we address remedies briefly. In deciding the justiciability of the Education Clause claim in our prior decision, we explained that the parents are simply asking "the judiciary to answer a yes or no question—whether the Legislature has violated its constitutional duty." *Cruz-Guzman I*, 916 N.W.2d at 9. We cautioned against "prematurely speculat[ing] about hypothetical remedies," *id.* at 14, stressing that "specific determinations of educational policy are matters for the Legislature," *id.* at 9. This caution continues to apply on remand.

**CONCLUSION**

For the foregoing reasons, we answer the certified question as reformulated in the negative. We hold that racial imbalances in Minneapolis and Saint Paul public schools, as compared to other schools in the same school district, are not sufficient, standing alone, to establish a violation of the Education Clause of the Minnesota Constitution. Although the parents do not need to prove that state action caused the racial imbalances, to succeed on a

28

claim premised on racial imbalances they must prove that racially imbalanced schools are a substantial factor in causing their children to receive an inadequate education. We answer the certified question, as reformulated, in the negative, and remand to the district court for further proceedings.

Remanded.


PROCACCINI, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

DISSENT

HUDSON, Chief Justice (dissenting).

Nearly 70 years ago, a time when segregation was enforced by law, our legal system committed itself to eradicating root and branch the evil of racial segregation in public schools. *Brown v. Bd. of Educ.*, 347 U.S. 483, 495 (1954). Since *Brown*, our nation has taken great strides to eliminate intentional and state-sponsored—known as "de jure"—segregation in public schools.

But to conclude that we have bid good riddance to segregation in public schools would be premature. Although segregation in public schools is no longer mandated by ordinances and statutes, a confluence of public and private forces have kept the ugly heritage of segregation alive. These forces are legion: racial covenants in housing, discriminatory housing finance programs, exclusionary zoning policies, wealth disparities, and government indifference, among others. *See* Chad Montrie, *Whiteness in Plain View: A History of Racial Exclusion in Minnesota* 136–37 (2022); Richard Thompson Ford, *Brown's Ghost*, 117 Harv. L. Rev. 1305, 1313–16 (2004). As appellants ("the parents") and the amici persuasively demonstrate, these forces have contributed to a system of public schools in Minneapolis and Saint Paul that are indisputably "de facto" segregated on the basis of race, widening the achievement gap between white students and students of color and diminishing the opportunity for cross-cultural understanding.

The State asks us to treat de facto segregation as conceptually distinct from de jure segregation for purposes of our constitutional analysis. But given the historical

entanglement of the State with the rise of de facto segregation in the Twin Cities, we should view the State's request with a jaundiced eye.

To that end, the court rightfully rejects the State's argument that the Education Clause of the Minnesota Constitution has nothing to say about this sordid state of affairs. Indeed, I agree with much of the court's opinion. I agree with the court's decision to reformulate the certified question.[1] I agree with the court that the parents read far too much into footnote six in *Cruz-Guzman I*. I agree with the court's conclusion that, on remand, the parents can establish a violation of the Education Clause without showing that the Legislature intended to violate the Clause.[2] I agree with the court that the Legislature's duty under the Education Clause extends to matters "on the district or smaller level," not just to "statewide characteristics of the education program." And I agree that we should

---

[1]    I agree with the reformulated certified question but with one caveat. The court states that we should consider the de facto segregation in Minneapolis and Saint Paul public schools, *as compared to other schools in those districts*. Based on the parents' complaint, I think this is misguided. It is not true that the parents' allegations "focus on racial imbalances in Minneapolis and Saint Paul public schools as compared to other schools in the same school district." In arguing that the State has a duty to remedy de facto segregation in Minneapolis and Saint Paul public schools, the parents compare the racial imbalances and achievement gaps in Minneapolis and Saint Paul public schools to other schools in those districts *and* schools in whiter and wealthier suburban districts of the Twin Cities. The parents also argue that the drawing of district lines between the suburbs and the Twin Cities contributes to de facto segregation in Minneapolis and Saint Paul public schools. Because the parents' argument is contextualized within the greater Twin Cities metropolitan area, I believe that where necessary, our analysis should be as well.

[2]    While I express no disagreement with the court basing this conclusion on the State's concession that the Education Clause contains no intent requirement, I would affirmatively hold that this result is commanded because the Education Clause does not, in fact, contain an intent requirement.

not prematurely speculate about the constitutionality of hypothetical remedies. But the court goes awry when it holds that to state a claim for de facto segregation under the Education Clause, a plaintiff must show that segregation is a "substantial factor" in bringing about an inadequate education. That holding has no basis in the text of the Education Clause, and it undermines the Clause's purpose in providing all Minnesota students with "an education which will fit them to discharge intelligently their duties as citizens of the republic." *Bd. of Educ. of Sauk Ctr. v. Moore*, 17 Minn. 412, 416 (Minn. 1871). Because I would hold that the de facto segregation in Minneapolis and Saint Paul public schools is sufficient, standing alone, to establish a violation of the Education Clause, I respectfully dissent.

A.

To understand my disagreement with the court's holding, we must first understand what de facto segregation entails. The court distinguishes between de jure segregation—"intentional segregation"—and de facto segregation—"racial imbalance." The U.S. Supreme Court similarly defines de jure segregation as "segregation by state action" and de facto segregation as "racial imbalance caused by other factors." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 736 (2007). But this distinction does not tell the whole story. Rather, an honest review of the historical record illustrates that de facto segregation is a direct byproduct of decades of state action and inaction.

Given the typical connection between where one lives and where one goes to school, let's focus on housing. For many years, federal, state, and local policies dictated where people of color could live in the Twin Cities. For example, racially restrictive covenants—

that is, provisions in a deed that prohibit a buyer of property from allowing occupancy by members of a given race—were introduced to the Twin Cities in 1910. Kirsten Delegard, *Racial Housing Covenants in the Twin Cities*, Minn. Hist. Soc'y, https://www.mnopedia.org/thing/racial-housing-covenants-twin-cities (last modified July 15, 2021) [opinion attachment]. And until the Minnesota Legislature banned the use of racially restrictive covenants in 1953, developers inserted racially restrictive covenants into thousands of deeds across Minneapolis and Saint Paul.[3] *Id.* The enforcement of these covenants—notably, by state actors, *see Shelley v. Kraemer*, 334 U.S. 1, 19 (1948)—cemented lines of racial segregation in Twin Cities neighborhoods. Delegard, *supra*.

Restrictive covenants were not the only state-backed tools at the segregationists' disposal. In the 1930s and 1940s, the federal government established low-interest, government-insured mortgages to encourage homeownership and support the floundering real estate market. Richard Rothstein, *The Color of Law: A Forgotten History of How Our Government Segregated America* 63–64 (2017). But to receive one of those mortgages, a borrower and the prospective property had to meet certain guidelines set by the federal government. Montrie, *supra*, at 136.

Unfortunately for borrowers of color, federal authorities deemed homes in majority-Black neighborhoods risky investments, and consequently, Black Americans were

---

[3]     I encourage readers to explore the Mapping Prejudice Project at the University of Minnesota. The Project's website contains maps showing the locations of properties in Hennepin and Ramsey Counties that have been encumbered by a racially restrictive covenant. *See Mapping Prejudice*, U. Minn., https://mappingprejudice.umn.edu/racial-covenants/maps-data (last visited July 6, 2023).

overwhelmingly barred from securing mortgages to purchase homes in majority-Black neighborhoods. *Id.* And borrowers of color also could not secure government-insured mortgages in majority-white neighborhoods, as the federal mortgage guidelines "discouraged mixing of 'inharmonious races and classes.' " *Id.* Thus, between restrictive covenants, discriminatory housing finance programs, and other state and local policies, people of color in the Twin Cities were largely boxed out of homeownership and became increasingly concentrated in "pocket areas" that remain to this day. *Id.* at 138–39.

Although these policies are no longer enforceable, they are not ancient history. Neighborhoods segregated by state policies have stubbornly stayed that way for generations. *See* Nancy A. Denton, *The Persistence of Segregation: Links Between Residential Segregation and School Segregation*, 80 Minn. L. Rev. 795, 795–96 (1996) ("Trends in residential segregation during the past four decades are very clear. To put it bluntly, neighborhood segregation . . . has been high, continues to be high, and can be expected to remain high in the foreseeable future."). The segregation of cities by state policies has also fueled an attendant geographic concentration of poverty, such that today, urban neighborhoods with high poverty rates are overwhelmingly occupied by people of color. *See* Myron Orfield, *Milliken, Meredith, and Metropolitan Segregation*, 62 UCLA L. Rev. 364, 430–31 (2015). And courts and social scientists have long recognized that there is often a "profound reciprocal effect" between the racial composition of residential neighborhoods and the racial composition of neighborhood schools. *Keyes v. Sch. Dist. No. 1*, 413 U.S. 189, 202 (1973); *see also* Owen M. Fiss, *Racial Imbalance in the Public Schools: The Constitutional Concepts*, 78 Harv. L. Rev. 564, 584–88 (1965).

B.

The above-described background is only one piece of the historical puzzle, but it is important to the analysis of this case because "a page of history is worth a volume of logic." *N.Y. Tr. Co. v. Eisner*, 256 U.S. 345, 349 (1921). With this background in mind, I now turn to evaluating how the present system of segregated schools in Minneapolis and Saint Paul violates the Education Clause of the Minnesota Constitution. That clause provides:

> The stability of a republican form of government depending mainly upon the intelligence of the people, it is the duty of the legislature to establish a general and uniform system of public schools. The legislature shall make such provisions by taxation or otherwise as will secure a thorough and efficient system of public schools throughout the state.

Minn. Const. art. XIII, § 1. It is true that "we have not had many occasions to interpret or apply the Education Clause." *Cruz-Guzman v. State (Cruz-Guzman I)*, 916 N.W.2d 1, 8 (Minn. 2018). But our precedent has established some baseline principles.

The Education Clause grants all students in Minnesota a fundamental right to an adequate education. *Skeen v. State*, 505 N.W.2d 299, 315 (Minn. 1993). The duty to provide an adequate education rests squarely with the Legislature. *State ex rel. Klimek v. Sch. Dist. No. 70*, 283 N.W. 397, 398 (Minn. 1939). While school districts carry out "the public duty of educating the children of the state," the constitutional buck ultimately stops at the Legislature because school districts "are always under the control of the Legislature." *Kramer v. Renville Cnty.*, 175 N.W. 101, 101–02 (Minn. 1919).

While we have not explicitly adopted any factors for evaluating "adequacy" under the Education Clause, we have cited approvingly to the factors articulated in *Pauley v.*

D-6

*Kelly*, 255 S.E.2d 859 (W. Va. 1979). *See Skeen*, 505 N.W.2d at 310–11 (citing and quoting *Pauley*, 255 S.E.2d at 877). These factors are:

> (1) literacy; (2) ability to add, subtract, multiply and divide numbers; (3) knowledge of government to the extent that the child will be equipped as a citizen to make informed choices among persons and issues that affect his own governance; (4) self-knowledge and knowledge of his or her total environment to allow the child to intelligently choose life work—to know his or her options; (5) work-training and advanced academic training as the child may intelligently choose; (6) recreational pursuits; (7) interests in all creative arts, such as music, theatre, literature, and the visual arts; (8) social ethics, both behavioral and abstract, to facilitate compatibility with others in this society.

*Id.* (citing and quoting *Pauley*, 255 S.E.2d at 877). At base, the animating purpose of the Education Clause is to provide all students in Minnesota with "an education which will fit them to discharge intelligently their duties as citizens of the republic." *Bd. of Educ. of Sauk Ctr.*, 17 Minn. at 416.

Applying these principles here leads to the inescapable conclusion that a system of segregated schools in Minneapolis and Saint Paul violates the Legislature's duty to furnish an adequate education to all students in Minnesota.

First, the record illustrates that de facto segregation in Minneapolis and Saint Paul public schools has gone hand in hand with depressed academic outcomes for students of color. *See Skeen*, 505 N.W.2d at 310–11 (recognizing academic achievement as part of an adequate education). Between 1995 and 2021, the Twin Cities saw a twelve-fold increase in the number of hyper-segregated public schools. Paired with this burgeoning segregation are appalling and persistent racialized disparities in academic outcomes in Twin Cities

public schools.[4]  For example, in 2019, while 76 percent of white students in Minneapolis Public Schools demonstrated proficiency in mathematics, only 19 percent of the district's Black students, 26 percent of its Latino students, and 17 percent of its Native American students could demonstrate that same proficiency.  During that same year, while 73 percent of white students in the Saint Paul Public Schools demonstrated proficiency in reading, only 25 percent of the district's Black students, 30 percent of its Latino students, and 32 percent of its Native American students could demonstrate reading proficiency.  Notably, measures of academic achievement in Minneapolis and Saint Paul public schools are markedly lower than measures of achievement in suburban school districts with whiter and wealthier student populations.

---

[4]     The court argues that "answering the certified question does not require us to define the contours of an adequate education under the Education Clause."  But the reformulated certified question asks whether the existence of de facto segregation in Minneapolis and Saint Paul public schools, standing alone, is sufficient "to establish a violation of the Education Clause."  And the Education Clause is violated when the Legislature fails to furnish "a 'general and uniform system of education' which provides an adequate education to all students in Minnesota." *Skeen*, 505 N.W.2d at 315.  Putting two and two together, answering whether the Education Clause is violated in this case requires at least some examination into the adequacy of the system of education at issue.  In conducting my adequacy analysis, I draw on the robust record in this case.  Although the court criticizes my reliance on secondary sources, those sources are only used to support the undisputed factual record, which—as we already established in *Cruz-Guzman I*, 916 N.W.2d at 5— demonstrates high levels of de facto segregation in Minneapolis and Saint Paul public schools and corresponding racialized disparities in academic outcomes in the Twin Cities.  A remand for further factual development would be necessary if I agreed that the parents must show causation between racial imbalances and academic achievement, as there is no evidence in the record explicitly demonstrating such causation.  But because I reject such a causation requirement, *see infra* at Part D.1, the record sufficiently supports my position.

Despite these stark figures, the court requires the parents to prove that there is a causal connection between the abysmal racialized disparities in academic outcomes in the Twin Cities and the present state of de facto school segregation. But this holding amounts to closing our eyes to what history and modern reality have demonstrated to be true: Where racially segregated neighborhoods exist, the historical result has been racialized disparities in academic outcomes.[5] *See State v. Russell*, 477 N.W.2d 886, 888 n.2 (Minn. 1991) (explaining that courts "cannot and must not close our eyes when presented with evidence that certain laws, regardless of the purpose for which they were enacted, discriminate unfairly on the basis of race"). Indeed, we already made this observation in *Cruz-Guzman I*:

---

[5] Just a few pieces of scholarly work confirming this conclusion include: U.S. Gov't Accountability Off., GAO-22-104737, *K-12 Education: Student Population Has Significantly Diversified, but Many Schools Remain Divided Along Racial, Ethnic, and Economic Lines* 7 (2022); Ann Owens, *Income Segregation Between School Districts and Inequality in Students' Achievement*, 91 Soc. Educ. 1, 17–18 (2018); Sean F. Reardon, *School Segregation and Racial Academic Achievement Gaps*, 2 Russell Sage Found. J. Soc. Sci. 34, 47 (2016) ("The results of these descriptive analyses are unequivocal. Racial segregation is strongly associated with racial achievement gaps, and the racial difference in the proportion of students' schoolmates who are poor is the key dimension of segregation driving this association."); Richard Rothstein, *The Racial Achievement Gap, Segregated Schools, and Segregated Neighborhoods: A Constitutional Insult*, 7 Race and Soc. Probs. 21, 22–23 (2015) (concluding that concentrating students with social and economic disadvantage in racially and economically homogenous schools depresses student achievement); Dennis J. Condron et al., *Racial Segregation and the Black/White Achievement Gap, 1992 to 2009*, 54 Soc. Q. 130, 149–51 (2013) ("Our analyses strongly suggest that this school segregation fuels learning disparities between black and white students in the United States."); Geoffrey D. Borman & Maritza Dowling, *Schools and Inequality: A Multilevel Analysis of Coleman's Equality of Educational Opportunity Data*, 112 Tchrs. C. Rec. 1201, 1239 (2010); Roslyn Arlin Mickelson, *The Academic Consequences of Desegregation and Segregation: Evidence from the Charlotte-Mecklenburg Schools*, 81 N.C. L. Rev. 1513, 1546 (2003).

The public schools in Minneapolis and Saint Paul that appellants' children and other school-age children attend are "disproportionately comprised of students of color and students living in poverty, as compared with a number of neighboring and surrounding schools and districts." These segregated and "hyper-segregated" schools have significantly worse academic outcomes in comparison with neighboring schools and suburban school districts in measures such as graduation rates; pass rates for state-mandated Basic Standards Tests; and proficiency rates in math, science, and reading.

916 N.W.2d at 5. Other courts analyzing constitutional claims involving de facto segregation have made the same self-evident observation. *See Lee v. Nyquist*, 318 F. Supp. 710, 714 (W.D.N.Y. 1970) ("[I]t is by now well documented and widely recognized by educational authorities that the elimination of racial isolation in the schools promotes the attainment of equal educational opportunity and is beneficial to all students."), *summarily aff'd*, 402 U.S. 935 (1971); *Booker v. Bd. of Educ. of Plainfield*, 212 A.2d 1, 6 (N.J. 1965) (recognizing that "leading educators stress the democratic and educational advantages of heterogeneous student populations and point to the disadvantages of homogeneous student populations"); *Crawford v. Bd. of Educ. of Los Angeles*, 551 P.2d 28, 37–38 (Cal. 1976) (explaining that "the *Brown* court's conclusion that 'separate educational facilities are inherently unequal' . . . has traditionally been true of de facto segregated schools as well as de jure segregated schools," and detailing findings to that effect from a comprehensive study by the U.S. Commission on Civil Rights). I would follow the path of these courts and decline to make the parents prove a proposition already established by courts and scholars for decades.[6]

---

[6]    As discussed more thoroughly *infra* Part D.1, it is unclear why the parents even need to prove the relevance of de facto segregation as it relates to the undisputed racialized

Even putting aside academic performance as a measure of adequacy, a system of segregated public schools in Minneapolis and Saint Paul violates the Education Clause for a second, independent reason. Adequacy means more than competency in reading, writing, and mathematics. Rather, it broadly encompasses all competencies that allow Minnesota students "to discharge intelligently their duties as citizens of the republic." *Bd. of Educ. of Sauk Ctr.*, 17 Minn. at 416. One of those competencies, as we recognized in *Skeen*, is "social ethics, both behavioral and abstract, to facilitate compatibility with others in this society." 505 N.W.2d at 311 (quoting *Pauley*, 255 S.E.2d at 877).

A system of segregated schools in Minneapolis and Saint Paul strikes at the heart of this core competency. Since *Brown*, legal scholars and social scientists have recognized that a diverse student population "promotes cross-racial understanding, helps to break down racial stereotypes, and enables students to better understand persons of different races." *Fisher v. Univ. of Tex. at Austin*, 579 U.S. 365, 381 (2016) (citation omitted) (internal quotation marks omitted). Indeed, the value of meaningful cross-racial interactions "in improving race relationships and reducing group-based stereotypes has been thoroughly demonstrated in a large body of psychological research spanning well over half a century." Kevin Woodson, *Diversity Without Integration*, 120 Penn. St. L. Rev. 807,

---

disparities in academic outcomes in Twin Cities public schools. The Education Clause is violated by an inadequate education, regardless of how that inadequate education arose. *See Skeen*, 505 N.W.2d at 315. So, even if we set aside the segregative context in which these disparities arise, it cannot be denied that the disparities still exist, and the undisputed fact that students of color in Minneapolis and Saint Paul public schools consistently fail to achieve adequate academic outcomes facially violates *Skeen*'s mandate that all students receive an adequate education.

844–47 (2016) (citing studies supporting these findings). Social science research further indicates that there are long-term benefits of diverse schools, such as "a perpetuation effect that results in students leading more desegregated lives as adults and higher levels of democratic engagement." Erica Frankenberg, *Assessing the Status of School Desegregation Sixty Years after* Brown, 2014 Mich. St. L. Rev. 677, 691 (citing studies supporting these findings).

Segregation—regardless of its origins—frustrates an essential goal of an adequate education. When schools become racial silos, students lack the opportunity to deconstruct racial biases and forge lasting social bonds. As *Brown* stressed, education "is the very foundation of good citizenship" and "a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Brown*, 347 U.S. at 493. An adequate education in our multicultural nation, therefore, must nurture cross-racial understanding and "social ethics, both behavioral and abstract, to facilitate compatibility with others in this society." *Skeen*, 505 N.W.2d at 311 (quoting *Pauley*, 255 S.E.2d at 877); *see also Booker*, 212 A.2d at 6 ("In a society such as ours, it is not enough that the 3 R's are being taught properly for there are other vital considerations. The children must learn to respect and live with one another in multi-racial and multi-cultural communities and the earlier they do so the better.").

In sum, while the court requires the parents to demonstrate that a system of de facto segregated schools causes an inadequate education, I would hold that a system of de facto segregated schools *is* an inadequate education.

The State argues that the Education Clause is not concerned with de facto segregation because the text of the Education Clause says nothing "about the demographics of students in schools in the absence of *de jure* segregation." That textual observation is true enough, but the text of the Education Clause also says nothing about the adequacy of an education. And yet, we have interpreted the Education Clause to guarantee all students in Minnesota an adequate education. *Skeen*, 505 N.W.2d at 315.

Under the State's interpretative framework, the constitution has nothing to say about a particular social issue unless the issue is precisely delineated in the constitution's text. Of course, the framers of the Education Clause did not speak to the precise issue of de facto segregation—probably because at the time that the Education Clause was drafted in 1857, slavery and de jure segregation were still the law of the land in this country. *See* Minn. Const. art. VIII, § 1 (1857); *Dred Scott v. Sandford*, 60 U.S. 393 (1857); *see also* Christopher P. Lehman, *Slavery in the Upper Mississippi Valley, 1787–1865* 114 (2011). But the Clause is animated by a promise, "intended to endure for ages to come," *McCulloch v. Maryland*, 17 U.S. 316, 415 (1819), that all Minnesotans receive "an education which will fit them to discharge intelligently their duties as citizens of the republic." *Bd. of Educ. of Sauk Ctr.*, 17 Minn. at 416. As I have explained, that constitutional promise is violated when public school students in our state's largest metropolitan area are de facto segregated by race.

Relatedly, the State argues that comparing percentage variations in schools' racial demographics is not easily administrable and will lead to "absurd results." Admittedly, determining when a system of public schools becomes intolerably "de facto" segregated as

to deny students their right to an adequate education may not be a precise science. But courts have long adjudicated constitutional claims premised on evidence of statistical variations. *See, e.g.*, *Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253, 259 (2016) (holding that redistricting plans "with a maximum population deviation under 10%" do not raise an inference that the Fourteenth Amendment's "one person, one vote" command has been violated) (citation omitted); *Miller-El v. Dretke*, 545 U.S. 231, 265–66 (2005) (comparing statistical disparities in *voir dire* questioning by prosecutors to analyze whether peremptory challenges were used to unconstitutionally exclude jurors on the basis of race); *Castaneda v. Partida*, 430 U.S. 482, 495–96 (1977) (comparing disparities between racial groups on a grand jury and racial groups in the community to determine whether an equal protection violation had occurred); *Russell*, 477 N.W.2d at 887 n.1, 888 n.2, 889 (comparing racial disparities in convictions for crack cocaine to determine whether we should apply our heightened rational basis test).

These cases firmly reject the State's argument that constitutional claims that are difficult to adjudicate should not be adjudicated at all. And notably, while the State raises administrability concerns for calculating de facto segregation, nowhere does the State actually defend the current level of de facto segregation in Minneapolis and Saint Paul public schools as being capable of providing a constitutionally adequate education. That omission is telling.

C.

The intervening charter schools submit a slightly different argument: that their schools, which are indisputably "hyper-segregated" by race, provide a culturally affirming,

academically adequate education. The charter schools argue that their very existence disproves the notion that a system of segregated schools is a *per se* violation of the Education Clause. At base, they argue that there is a world of difference between schools segregated by state action and schools segregated by "parent choice."

For far too long, communities of color have watched their children languish in the traditional public school system, while their cries for reform fell largely on deaf ears. These communities have grown tired and impatient. The development of charter schools is thus an understandable response to the systemic neglect and indifference that children of color have faced for decades. All parents—regardless of race—want some measure of control over that which shapes their children's destiny. I therefore do not question the sincerity of the parents at these charter schools who value the cultural affirmation that their children receive and believe that their children are obtaining an adequate education.

But the Education Clause guarantees an adequate education to "all students in Minnesota," not merely the few[7] who are privileged to attend the intervening charter schools. *Skeen*, 505 N.W.2d at 315. Although the charter schools tout their own

---

[7] I say few, because the three intervening charter schools are not representatives of a court-decreed class. Rather, they represent only their institutions in this matter, not the interests of other non-party charter schools, as the district court recognized. Moreover, while no one disputes the academic performance of the intervening charter schools, the record contains evidence that the academic achievements of the intervenors may be outliers among charter schools with a high concentration of students of color.

successes,[8] they do not grapple with the indisputable de facto segregation and racialized disparities in academic outcomes occurring outside of their schoolhouse walls.

Most critically, compliance with the Education Clause is measured by what the Legislature has accomplished, not by what individual charter schools have achieved. *See Cruz-Guzman I*, 916 N.W.2d at 9 (asking, in the context of an Education Clause challenge, "whether the *Legislature* has violated its constitutional duty under the Education Clause") (emphasis added). This means that we must look at the full picture of education in the Twin Cities, not just one piece of the puzzle, and assess the relative harms that the status quo presents to the mandate of an adequate education. Here, the charter schools do not contest the undeniable fact that noncharter public schools in Minneapolis and Saint Paul— that is, the majority of highly segregated public schools in Minneapolis and Saint Paul identified in the complaint—are highly segregated by race, and that those school systems demonstrate wide achievement gaps between white students and students of color and diminished opportunity for cross-cultural understanding.

This significant harm is enough to find that the Legislature has failed to furnish "a general and uniform system of public schools" that is "thorough and efficient." Minn.

---

[8] Interestingly, the charter schools seem to define adequacy solely in reference to test scores and academic performance. But as our precedent makes clear, "adequacy" under the Education Clause encompasses all competencies that allow students in Minnesota "to discharge intelligently their duties as citizens of the republic." *Bd. of Educ. of Sauk Ctr.*, 17 Minn. at 416. One of these competencies, as we recognized in *Skeen*, is "social ethics, both behavioral and abstract, to facilitate compatibility with others in this society." 505 N.W.2d at 311 (quoting *Pauley*, 255 S.E.2d at 877). Nowhere do the charter schools explain how their hyper-segregated institutions promote this core competency, or any other core competency other than test performance.

Const. art. XIII, § 1.  Students in noncharter public schools cannot be forgotten in the constitutional equation.  The fact that some charter schools may be "beating the odds" does not undermine this conclusion.  Simply put, the Education Clause does not permit the State to satisfy its constitutional duty by building islands of adequacy in a sea of disparities.

D.

1.

As stated earlier, I agree with the court on many points, but I cannot agree with the court's baseline holding that to establish a claim for de facto segregation under the Education Clause, a plaintiff must show that segregation is a "substantial factor" in bringing about an inadequate education.  "When resolving a constitutional issue, we look first to the language of the constitution." *Schowalter v. State*, 822 N.W.2d 292, 300 (Minn. 2012).  Given the court's holding, one would reasonably expect to see elements of causation incorporated into the text of the Education Clause.

Yet there are none.  Rather, the Education Clause unambiguously states that "it is the duty of the legislature to establish a general and uniform system of public schools"—full stop.  Minn. Const. art. XIII, § 1.  This language places no burden of showing causation on those bringing a claim under the Education Clause—in fact, the only burden mentioned in the Education Clause is the burden on the *Legislature* "to establish a general and uniform system of public schools." *Id.*

Indeed, the Education Clause is unique in that it "is the only section of the Minnesota Constitution that imposes an explicit 'duty' on the Legislature." *Cruz-Guzman I*, 916 N.W.2d at 9.  That distinctive wording highlights the deliberate choice made by the

framers of the Education Clause to prize and guarantee an adequate public education for all Minnesotans. And that choice is appropriate, given the Clause's recognition of the importance of public education to democratic self-governance and the well-being of our state. Minn. Const. art. XIII, § 1 (explaining that the "stability of a republican form of government depend[s] mainly upon the intelligence of the people"). Yet, the court's holding flips the constitutional text on its head by placing the burden on students and parents to demonstrate that the Legislature has failed to provide an adequate education.[9] By fashioning a causation requirement out of whole cloth, the court disregards the balance struck by the framers in favor of a robust system of public education.

Not only does the court assiduously avoid the constitutional text and the animating purpose of the Clause, but the court also fails to cite any authority analogizing constitutional violations to torts or applying tort law principles like proximate cause to constitutional questions. In short, nothing in the text of the Education Clause, the purpose of the Clause, or our precedent justifies equating the institution of segregation to a garden-variety tort by applying a "substantial factor" causation analysis.

Moreover, the court wholly ignores the parents' argument that the mandate of the Education Clause sounds in contract, not tort. This is a curious choice, because we have

---

[9] The court claims that a showing of causation is required "[b]ecause the parents' Education Clause claim is specifically premised on the existence of racial imbalances in Minneapolis and Saint Paul public schools." This factual observation is true enough, but the court does not explain why an unremarkable factual observation should compel the *legal* conclusion that a causation requirement is warranted for the parents' Education Clause claims. All the court offers is our general observation from *Cruz-Guzman I* that the role of the judiciary is limited to assessing "whether constitutional requirements have been met." 916 N.W.2d at 12.

described the Minnesota Constitution as "a contract between the people and those persons whom the people choose to put in a position of having sovereign power." *State v. Lessley*, 779 N.W.2d 825, 833 (Minn. 2010); *see also* Anita L. Allen, *Social Contract Theory in American Case Law*, 51 Fla. L. Rev. 1, 2–10 (1999) (describing the influence of contractual thinking on the development of the U.S. Constitution and American case law).

At the end of the day, we need not decide the philosophical underpinnings of the parents' claims and whether they sound in tort, contract, or otherwise. We can—and must—simply rely on the language of the Education Clause. *See Schroeder v. Simon*, 985 N.W.2d 529, 536 (Minn. 2023). That language directs us to answer a single question: has the Legislature met its duty to provide an adequate education to all Minnesotans? *Cruz-Guzman I*, 916 N.W.2d at 9. Here, the answer is no, and nothing more from the plaintiffs is required. It is therefore error for the court to graft onto the Education Clause an additional, artificial hurdle to relief.

2.

Our precedent and the plain language of the Education Clause suffice to reject the court's holding. But there is a further prudential reason why we should hesitate to graft a causation element onto the Education Clause, particularly in cases involving de facto segregation.

On its face, the court's causation requirement mandates that a plaintiff meet only one stage of proof. That is, establishing that "racial imbalance" is a substantial factor in bringing about an inadequate education. In cases of de jure segregation, this may well be straightforward. De jure segregation cases are easy to understand and easy to adjudicate

because they boil down to a single cause: a particular governmental policy that says who can go to what school. But far more common and more complex are cases of de facto segregation. And unlike de jure segregation, de facto segregation is not reducible to a single, easily traceable cause. Rather, de facto segregation in public schools is fueled by a constellation of public and private forces, both historic and modern. As noted above, these forces include racially restrictive covenants, discriminatory housing finance programs, exclusionary zoning policies, wealth disparities, and implicit and explicit bias. *See supra* at Part A.

Given the unique nature of de facto segregation, to ask whether "racial imbalance" is a substantial factor in bringing about an inadequate education is, implicitly, to ensconce the guarantee of the Education Clause behind an onerous requirement of two-stage proof.[10] That is, where racial imbalance stems from de facto, as opposed to de jure, segregation, a plaintiff will first carry the burden of proving the existence of de facto segregation, and then carry the further burden of proving that this was a substantial factor in causing their child's inadequate education.

This endeavor is as Herculean as it is consequential, for de facto segregation is a phenomenon caused by a constellation of forces, both public and private. Social scientists have tried for decades to understand how, and to what extent, these various forces interact to produce the modern pattern of racial imbalances in neighborhoods and schools. *See* Ford, *supra*, at 1313–16 (surveying the various forces contributing to de facto segregation);

---

[10]     Even the State acknowledges that "neither traditional notions of causation nor intent are well suited to this unique constitutional claim."

Robert L. Hayman, Jr. & Nancy Levit, *The Constitutional Ghetto*, 1993 Wis. L. Rev. 627, 643 (observing that the "official and social causes [of segregation] might not be readily separable"). Placing such a weighty burden on the parents seems incongruous with the Education Clause's text, which places the burden solely on the *Legislature* to furnish an adequate education.[11]

E.

"Although formal race-linked legal barriers are gone, race still matters to the lived experiences of all Americans in innumerable ways." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. ___, 143 S. Ct. 2141, 2277 (2023) (Jackson, J., dissenting). Students of color in Minneapolis and Saint Paul public schools know this lesson all too well. When these students wake up each morning, many must face the harsh reality that the school they attend, the people with whom they interact, and their measures of academic success are influenced by the color of their skin. Make no mistake: This state of affairs disserves students of all races, for it perpetuates racial isolation and renders the next generation of Minnesotans ill-prepared "to discharge intelligently their duties as citizens" of a pluralistic, multiracial republic. *Bd. of Educ. of Sauk Ctr.*, 17 Minn. at 416.

---

[11] To the court's credit, counsel for the parents stated at oral argument that the parents would consent to the causation standard that the court announces today. But we are not bound by counsel's concession, for "it is the responsibility of appellate courts to decide cases in accordance with law, and that responsibility is not to be diluted by counsel's oversights." *State v. Hannuksela*, 452 N.W.2d 668, 673 n.7 (Minn. 1990) (citation omitted) (internal quotation marks omitted). For the reasons discussed in my dissent, I would not accept counsel's concession and would answer the reformulated certified question in the affirmative.

The court makes headway toward addressing this unfortunate reality, but it does not go the full distance that the Education Clause demands. That reticence is regrettable, for it delays the day when all children in Minnesota will secure the full promise of the education to which they are constitutionally entitled. Because the Education Clause tolerates no such delay, I dissent.



# Racial Housing Covenants in the Twin Cities

Creator:  Kirsten Delegard

Members of the *"Committee to End Discrimination against Fourth Class Whites"* protesting fair housing in St. Paul on December 19, 1962, St. Paul Pioneer Press. Minneapolis and St. Paul Newspaper Negatives Collection, Minnesota Historical Society.

Minneapolis real estate developers began writing racial covenants—race-based property ownership restrictions—into property deeds in 1910. They were banned by the Minnesota state legislature in 1953, but their use in the early twentieth century laid the foundation for contemporary racial disparities in Minnesota.

Racial covenants were legal clauses attached to property deeds. Parcels with these restrictions were reserved for the exclusive use of white people.

"Real covenants" were used before racial covenants became popular. They have been used to dictate everything from building heights to the location of vegetable gardens in residential developments. But in the late nineteenth century, real estate developers found a new application for this type of restriction embedded into property deeds. They invented covenants that wrote race onto the land.

Racial covenants were buoyed by a rising tide of white supremacy, which converged with a new determination to make cities more livable. They were offered as an answer to racial violence, with the explanation that neighborhoods needed to be racially segregated to foreclose conflict. Their use was driven by the conviction that the value of land was determined by the race of the people who lived on it. Covenants gave real estate investors the promise of security.

Over the next fifty years, racial covenants were inserted into millions of property deeds across the nation. These discriminatory deeds built a hidden system of American apartheid. Segregated bathrooms and "colored only" water fountains were public markers of white supremacy. By contrast, racial covenants were out of view in the deed books of county recorders. But these powerful restrictions re-worked the relationship between race and land tenure in Minnesota and other places imagined to be free from Jim Crow restrictions.

"Racial covenants" spread from California, where they were first cited in a lawsuit in 1892, through the rest of the country in the early years of the twentieth century. They were introduced to Minneapolis in 1910, when Henry and Leonora Scott sold a property to Nels Anderson. The deed for that transaction stipulated that "premises shall not at any time be conveyed, mortgaged or leased to any person or persons of Chinese, Japanese, Moorish, Turkish, Negro, Mongolian or African blood or descent."

Scott became the first president of the Seven Oaks Corporation, a real estate development company that inserted this same language into thousands of deeds across Minneapolis and St. Paul. By the 1930s, most new residential developments in the Twin Cities were covered by these kinds of racial restrictions.

Racial covenants were inspired by changing ideas about race and urban space. Like many cities in the north, Minneapolis was not especially segregated in 1900. But the city's racial climate shifted quickly. By 1908 white residents were raising new alarms about race

mixing. Denizens of the area around Fifth Avenue South organized to remove what they called "undesirable residents," explaining that "a negro is an undesirable resident of a white neighborhood." And white people in Prospect Park were horrified when the Jackson family—which was African American—built a new home on Franklin Avenue. The next year, when another black family joined the Jacksons on the block, residents erupted. A mob of 125 white men gathered on the Jacksons' lawn to threaten the families. Across town, neighbors in Linden Hills banded together to prevent an African American minister from buying a house.

The next year, the editorial board of the *Minneapolis Journal* called for coordinated action to make neighborhoods all white. The newspaper condemned mixed-race neighborhoods as "dangerous" and called on the city's real estate board to contain what it called the city's "considerable negro colony." Only 1 percent of the city's population was identified as African American. But in 1910, business and political leaders saw this small number of non-white residents as a threat to civic harmony and progressive development.

The Seven Oaks corporation recorded its first racial covenant that same year. It was just one of the real estate development companies that had begun experimenting with these new tools for shaping the urban landscape. Covenants had the enthusiastic support of the professionalizing real estate industry, which formed the National Association of Real Estate Boards (NAREB) in 1908. This group popularized the idea that residential segregation kept the peace and protected investment. By 1924, the NAREB had adopted a "code of ethics" that enjoined its members from "introducing into a neighborhood...members of any race or nationality...whose presence will clearly be detrimental to property values." In 1927, it issued a standard restrictive covenant for members to use in communities across the country.

Though many covenants named a laundry list of "objectionable" people, in Hennepin County, covenants were crafted mainly to exclude African Americans. But Jews were also a target. For instance, a 1919 advertisement in the Minneapolis Tribune appealed to anti-Semitic sentiments. Developer Edmund G. Walton offered "restricted" housing sites overlooking Lake of the Isles that could not "be conveyed mortgaged or leased to any person or persons of Chinese, Japanese, Moorish, Turkish, Negro, Mongolian, Semetic [sic] or African blood or descent."

But later that same year, the Minnesota legislature banned real estate restrictions based on religious faith or creed. This might explain why less than one percent of the covenants identified by the Mapping Prejudice Project (as of 2019) contain anti-Semitic restrictions like the one advertised by Walton. Thanks to the 1919 state law, the city's palpable anti-Semitism was only rarely articulated in racially restrictive deeds.

Covenants were difficult to challenge, especially after the US Supreme Court upheld these private restrictive agreements in *Corrigan v. Buckley* in 1926. They ran with the land, which meant that they could be enforced decades after they were put into place. Anyone who breached a covenant risked ending up in court. They could be sued and held financially liable—a powerful deterrent.

Most fearless in its campaign against racial covenants was the National Association for the Advancement of Colored People (NAACP), which brought a series of court challenges that ended up at the United States Supreme Court. In *Shelley V. Kraemer* (1948), that body declared covenants to be unenforceable. Though widely hailed as a triumph for civil rights, that decision ultimately did little to dissolve the barriers created by covenants.

In Minnesota, elected officials recognized that more action was necessary. The legislature banned new covenants in 1953. Then, in 1962, state lawmakers prohibited housing discrimination on the basis of race, religion and national origin. The federal government followed suit in 1968, when Congress passed the Fair Housing Act.

By the time that covenants were made illegal, the damage was already done. Covenants made it difficult for African Americans to secure stable and affordable housing, which affected the health, educational opportunities and job prospects of generations of residents. And covenants created patterns of residential segregation that persist today. They also determined who could buy property. In tandem with redlining—a banking practice that made it impossible to get loans for properties in racially mixed neighborhoods—racially restrictive deeds shut African Americans out of property ownership.

The legacies of these practices are clear today. In 2019, the Twin Cities have the lowest African American homeownership rate in the country. And since most families amass wealth through property ownership, this homeownership gap feeds the contemporary racial wealth gap. The wealth gap undergirds a whole host of other racial disparities, which are particularly acute in Minnesota.

© Minnesota Historical Society    (cc) BY-SA    Creative Commons Attribution-ShareAlike 3.0 Unported

First published: September 18, 2019
Last modified: July 15, 2021

# Bibliography

Advertisement placed by Edmund G. Walton in the *Minneapolis Sunday Tribune*, January 12, 1919.

Buchta, Jim. "Already-low Homeownership Rates of Twin Cities Minorities Fall Further." *Minneapolis Star Tribune*, August 19, 2017.

"End of Both Race Wars Believed Near at Hand." *Minneapolis Morning Tribune*, January 7, 1910.

"A Fair Housing Law." *Minneapolis Morning Tribune*. April 15, 1961.

Gonda, Jeffrey D. *Unjust Deeds: The Restrictive Covenant Cases and the Making of the Civil Rights Movement.* Chapel Hill: University of North Carolina Press, 2015.

"Harriet Negro Trouble Is Taken to the Police." *Minneapolis Morning Tribune*, December 29, 1909.

"Harriet Residents to Investigate Sale." *Minneapolis Morning Tribune*, December 31, 1909.

Jackson, Kenneth. *Crabgrass Frontier: The Suburbanization of the United States*. New York: Oxford University Press, 1985.

"Jim Crow of the North." Minnesota Experience, episode 20. Twin Cities PBS documentary aired February 25, 2019.

Jones-Correa, Michael. "The Origins and Diffusion of Racial Restrictive Covenants." *Political Science Quarterly* 115, no. 4 (2000 Winter):541–568.

Legislation banning covenants in Minnesota, Pub. L. No. HF210, § 507.18 (1953).

Long, Herman H, and Charles Spurgeon Johnson. *People vs. Property; Race Restrictive Covenants in Housing.* Nashville: Fisk University Press, 1947.

Mapping Prejudice Project.
www.mappingprejudice.org

Metropolitan Council. "Disparities Unmasked: The Twin Cities Metro in 2014." September 2015.

National Association of Real Estate Boards. *Code of Ethics*. [Washington, DC]: N.p., 1924.

"The Negro in Minneapolis." *Minneapolis Journal*, January 10, 1910.

"Negro Minister is Under Exclusion Ban." *Minneapolis Morning Tribune*, December 28, 1909.

Oliver, Melvin L., and Thomas M. Shapiro. *Black Wealth/White Wealth: A New Perspective on Racial Inequality*. New York: Routledge, 1995.

"Race War at Harriet Involves More Blacks." *Minneapolis Sunday Tribune*, January 2, 1910.

"Race War Started in Prospect Park." *Minneapolis Tribune*, October 22, 1909.

Rothstein, Richard. *The Color of Law : A Forgotten History of How Our Government Segregated America*. New York: Liveright Publishing Corporation, 2017.

Scott, Henry, and Leonora Scott to Nels Anderson. Transaction on May 26, 1910, Hennepin County Deeds Book 759, page 538, Document 712111, recorded April 23, 1914.

Sugrue, Thomas J. *The Origins of the Urban Crisis: Race and Inequality in Postwar Detroit*. Princeton: Princeton University Press, 2005.

Vose, Clement E. *Caucasians Only: The Supreme Court, the NAACP, and the Restrictive Covenant Cases*. Berkeley: University of California Press, 1959.

"White Folks Plan a Negro Quarter." *Minneapolis Journal*, May 20, 1908.

## Related Resources

### Primary

Mondale, Walter F., and Dave Hage. *The Good Fight: A Life in Liberal Politics*. Minneapolis: University of Minnesota Press, 2014.

Minutes and related records of the NAACP, 1904, 1905, 1934–1942
Manuscripts Collection, Minnesota Historical Society, St. Paul
Description: Minutes and related records of the National Association for the Advancement of Colored People, St. Paul Branch, 1904-1942.

Walter F. Mondale papers, 1900–2008 (bulk 1948–2002)
Manuscripts Collection, Minnesota Historical Society, St. Paul
Description: Senatorial, vice presidential, ambassadorial, political papers and campaign files, and personal papers of a United States Senator from Minnesota (1964-1976), Vice President of the United States (1977-1981), Ambassador to Japan (1993-1996), and Special Envoy to Indonesia (1998), documenting most aspects of Mondale's six-decade career, including all of his public offices, campaigns, and Democratic Party and other non-official activities. Minnesota Historical Society. Mondale was the author of the Fair Housing Act.
http://www2.mnhs.org/library/findaids/00697.xml

Papers of the National Association for the Advancement of Colored People
ProQuest Libguides
Description: Microfilm of the papers of the NAACP. This collection consists of six modules. It includes internal memos, legal briefings, and direct action summaries from national, legal, and branch offices throughout the country from 1909 to 1972.
https://proquest.libguides.com/historyvault/NAACP

*The Realtor: Weekly Bulletin of the Minneapolis Real Estate Board*. Minneapolis, Minnesota.

*The Negro and His Home in Minnesota*. Governor's Interracial Committee: St. Paul, 1947.
P317
Genevieve Steefel papers, 1923–1962
Manuscripts Collection, Minnesota Historical Society, St. Paul
Description: Correspondence, notes, clippings, printed materials, reports, speeches, minutes, and other papers of Genevieve (Mrs. Lawrence D.) Steefel, a leader in numerous Minnesota and Minneapolis religious, cultural, social welfare, and human rights organizations. Minnesota Historical Society.

Swanson, William. *Greater Minneapolis Area Board of Realtors, 1887–1987, Centennial*. Minneapolis: The Board, 1986.

P784
Edmund G. Walton and family papers, undated and 1874–1964
Manuscripts Collection, Minnesota Historical Society, St. Paul

Description: Correspondence, diaries, scrapbooks, newspaper clippings, photographs, and memorabilia relating to Edmund G. Walton, a prominent real estate developer and civic promoter in Minneapolis, and his family.

## Secondary

Abrams, Charles. *Forbidden Neighbors: A Study of Prejudice in Housing.* 1st ed.. Harper: New York, 1955.

Helper, Rose. *Racial Policies and Practices of Real Estate Brokers.* Minneapolis, University of Minnesota Press, 1969.

*The House We Live in: Race—the Power of an Illusion.* New York: Films Media Group, 2012.

Juergens, Ann. "Lena Olive Smith: A Minnesota Civil Rights Pioneer." *William Mitchell Law Review* 28, no. 1 (2001): 397–453. Originally found at: https://open.mitchellhamline.edu/cgi/viewcontent.cgi?article=1060

Massey, Douglas S., and Nancy A. Denton. *American Apartheid: Segregation and the Making of the Underclass.* Cambridge, MA: Harvard University Press, 1993.

Montrie, Chad. "'A Bigoted, Prejudiced, Hateful Little Area': The Making of an All-White Suburb in the Deep North." *Journal of Urban History* 45, no. 2 (2019): 300–320.

Squires, Gregory D., ed. *The Fight for Fair Housing: Causes, Consequences, and Future Implications of the 1968 Federal Fair Housing Act.* 1st edition. New York: Routledge, 2017.

## Web

"Code of Ethics." Adopted by the National Association of Real Estate Boards at its Seventeenth Annual Convention, June 6, 1924. https://www.nar.realtor/about-nar/history/1924-code-of-ethics

United States. Federal Housing Administration. Underwriting Manual: *Underwriting And Valuation Procedure Under Title II of the National Housing Act. Federal Housing Administration.* Washington, DC: U.S. Government Printing Office, 1936. https://www.huduser.gov/portal/sites/default/files/pdf/Federal-Housing-Administration-Underwriting-Manual.pdf

## Turning Point

In 1910 the first racial covenant is inserted into a Minneapolis property deed.

## Chronology

1910    The first racial covenant is recorded in Minneapolis.

1919    The Minnesota State Legislature bans real estate discrimination based on religion.

1924    The National Association of Real Estate Boards adopts a "code of ethics" that bars its members from "introducing into a neighborhood. .

.members of any race or nationality. . .whose presence will clearly be detrimental to property values."

1930s  Covenants are endorsed by federal agencies charged with supporting homeownership. Most real estate developers adopt these restrictions in the hopes of receiving favorable financing terms.

1940s  The NAACP launches a legal campaign against covenants.

1948  The United States Supreme Court rules in *Shelley v. Kramer* that covenants are unenforceable.

1953  The Minnesota Legislature bars new racial covenants.

1962  The Minnesota Legislature prohibits housing discrimination on the basis of race, religion, and national origin.

1968  Congress passes the Fair Housing Act, making covenants and other discriminatory housing practices illegal across the nation.